**TIANJIN MACHINERY IMPORT & EXPORT CORP. and Shandong Machinery Import & Export Corp., Plaintiffs,**

v.

**UNITED STATES of America and United States Department of Commerce, Defendants,**

and

**Woodings-Verona Tool Works, Defendant-Intervenor.**

**Court No. 91-03-00223.**

United States Court of International Trade.

Oct. 23, 1992.

Skadden, Arps, Slate, Meagher & Flom, Rodney O. Thorson, John J. Burke, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Marc E. Montalbine, Joan L. Mackenzie, of counsel, Atty. Advisor, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendants.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martyn III, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION

GOLDBERG, Judge:

This action comes before the court on plaintiffs' motion for judgment upon the agency record and request for remand. Plaintiffs challenge the Department of Commerce, International Trade Administration's ("Commerce's") determination in *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China.* 56 Fed.Reg. 241 (1991) (final determination). The court sustains Commerce's determination in part. The court also finds that Commerce's determination, in part, was not based upon substantial evidence or in ac-

cordance with law, and grants plaintiffs' request for a remand as to that part.

## BACKGROUND

Defendant–Intervenor Woodings–Verona Tool Works ("Woodings–Verona"), a United States importer of heavy forged hand tools, filed an antidumping duty petition on behalf of the United States industry on April 4, 1990 ("Petition"). The Petition alleged that imports of hammers/sledges, bars/wedges, picks/mattocks, and axes/adzes from the People's Republic of China ("PRC") were being sold in the United States at less than fair value. It noted that the PRC had a nonmarket economy, and so calculated dumping margins using the factors of production analysis specified in 19 U.S.C. § 1677b(c)(1) (1988).[1]

Plaintiffs, Tianjin Machinery Import and Export Corporation ("Tianjin") and Shandong Machinery Import and Export Corporation ("Shandong"), along with Henan Machinery Import & Export Corporation ("Henan"), are the only three PRC companies that export the subject merchandise.

On April 27, 1990, counsel for China National Machinery Import and Export Corporation ("China National") filed a notice of appearance in connection with the Petition.

Commerce issued its questionnaire to China National in June, 1990. The questionnaire requested a consolidated response from China National, with information included from Tianjin, Shandong, and Henan. By statute, China National was also required to provide its responses on computer diskette.

China National informed Commerce that pursuant to a confidential PRC 1988 State Council Directive ("Directive"), plaintiffs and Henan were independent legal entities, and no longer affiliated branches of China National. Although Commerce subsequently requested a copy of the Directive along with official supporting documentation, China National only provided a certi-

---

**1.** Title 19 United States Code, Section 1677b(c)(1) (1988) provides that where the exporter is located in a nonmarket economy country, in certain circumstances, Commerce may determine the foreign market value of the mer-

chandise on the basis of the sum of the value of the factors of production utilized in producing the merchandise along with general expenses, profits, and costs.

fied statement by the China Council for the Promotion of International Trade which affirmed that the division had previously occurred.

Tianjin and Shandong submitted separate replies to section A of Commerce's questionnaire in mid-July, 1990. In July, 1990, China National requested several extensions of time in which to respond to the remainder of the questionnaire. Commerce granted the extensions and advised China National, both in writing and orally, to file a consolidated response since China National had not yet sufficiently shown that plaintiffs' were independent corporations.

In August, 1990, individual responses were submitted by Tianjin and Shandong to sections C and D of the questionnaire. No information whatsoever was submitted on behalf of Henan.

In September, 1990, Commerce issued two deficiency letters to China National. The first highlighted China National's failure to file a consolidated response and sufficiently support its claim of plaintiffs' independence. In addition to reiterating the points already made, the second notice also discussed missing or unclear information in China National's responses to sections A, C, and D of the questionnaire.

During this period, Commerce also agreed that China National's submissions could be in Lotus 1-2-3 personal computer software. Accordingly, on September 19, 1990 Shandong and Tianjin submitted separate responses on diskette. Without obtaining an extension of time, China National resubmitted a second diskette after the deadline for submissions passed, claiming that the first disk contained technical errors.

On October 19, 1990, Commerce issued its preliminary determination. *See Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 55 Fed. Reg. 42420 (Dep't Comm.1990) (prelim. determination). In it, Commerce stated that China National failed to provide diskettes formatted to allowed manipulation of information. It determined that the improperly formatted diskettes and the lack of accu-

rate and complete technical data regarding Shandong and Tianjin, in conjunction with the total disregard of sales information concerning Henan constituted fatal deficiencies. Consequently, Commerce used best information available ("BIA") to calculate China National's dumping margins. As BIA, Commerce used an average of the dumping margins for each class or kind of merchandise contained in the Petition. Because Commerce utilized BIA, it indicated it would not verify China National's responses.

On October 25, 1990, China National provided Commerce with an unusable "macro" computer formula designed to correct the computer formatting flaw. On November 9, 1990, China National submitted re-formatted diskettes. Commerce rejected the diskettes as untimely. China National also requested a postponement of Commerce's final determination to permit Commerce time to verify China National's recent submissions and to consider its other legal arguments. China National's request was denied.

On December 14, 1990, Mann Edge Tool Company ("Mann Edge"), a domestic producer of heavy striking tools, forwarded a letter to Commerce opposing the Petition. Mann Edge stated that it represented 27 percent of the United States market.

Commerce subsequently issued its final determination on January 3, 1991. *See Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China*, 56 Fed.Reg. 241 (Dep't Comm.1991) (final determination). It again noted that because China National's incomplete and unconsolidated responses were unusable, it utilized an adjusted average of dumping margins listed in the Petition as BIA.

Plaintiffs now challenge several aspects of Commerce's final determination. First, they assert Commerce improperly used BIA, and that sufficient data supported a finding that Tianjin and Shandong were separate legal entities. Secondly, the Petition contained several technical errors in its calculation of dumping margins. Next, Commerce improperly denied China Nation-

al's request for a postponement of the final determination. Finally, they contend that Woodings–Verona did not have standing to initiate the Petition.

## DISCUSSION

### A. Standard of Review

An antidumping determination will be overturned only if it is not supported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. 1516a(b)(1)(B) (1988). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.A.R. v. United States,* 14 C.I.T. ——, 741 F.Supp. 936, 939 (1990) (quoting *Gold Star Co. v. United States,* 12 C.I.T. 707, 708–709, 692 F.Supp. 1382 (1988) *aff'd,* 8 Fed.Cir. (T) ——, 873 F.2d 1427 (1989)).

■ Commerce is given "considerable deference in its interpretation of its statutory authority and the methodology employed in the administration of the antidumping law." *Tehnoimportexport v. United States,* 15 C.I.T. ——, 766 F.Supp. 1169, 1173 (1991) (citations omitted). Commerce's determination will not be overturned merely because the plaintiff can produce evidence in support of its own contentions and in opposition to the evidence supporting the agency's determination. *Tehnoimportexport,* 766 F.Supp. at 1173.

### B. Use of Best Information Available

Plaintiffs first challenge Commerce's reliance upon BIA. Plaintiffs initially argue that the "pretexts" upon which Commerce justified its use of BIA were "illusory" and unsupported by substantial evidence. Plaintiffs also contend that the information chosen by Commerce as BIA was improper.

Title 19 United States Code, Section 1677e(c) (1988) provides that Commerce shall:

whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

In this case, Commerce based its decision to use an average of the dumping margins contained in the Petition as BIA upon China National's failure to submit a consolidated response with information concerning Henan, its lack of accurate and complete technical data regarding Shandong and Tianjin, and its submission of defective computer diskettes.

#### 1. Consolidated Response by China National

■ Plaintiffs assert that China National was excused from submitting a consolidated response including Henan sales data because Tianjin, Shandong, and Henan were separate legal entities, and data related to Henan was unavailable to plaintiffs. Consequently, Commerce should not have resorted to BIA when calculating Tianjin's and Shandong's dumping margins. In support, plaintiffs rely upon *Olympic Adhesives, Inc. v. United States,* 8 Fed.Cir. (T) ——, 899 F.2d 1565 (1990). In *Olympic,* the respondent did not provide all the data sought by Commerce in its questionnaire because the requested data did not exist. Commerce characterized this response as a refusal to provide the requested data and relied upon BIA. The Court of Appeals for the Federal Circuit held that use of BIA was not justified simply because the respondent's full and complete answers to Commerce's questionnaire did not "definitely resolve the overall issue presented." (*Id.* 899 F.2d at 1574.)

However, plaintiffs' reliance on *Olympic* rests upon the assumption that the information sought by Commerce was unavailable to plaintiffs because plaintiffs were in fact separate legal entities. The court's first inquiry must be, therefore, whether substantial evidence supports Commerce's determination that plaintiffs were not independent from China National.

An exporter in a nonmarket economy country is entitled to separate, company-specific margins when the exporter can affirmatively demonstrate:

an absence of central government control, both in law and in fact, with respect

to exports. Evidence supporting, though not requiring, a finding of de jure absence of central control includes: (1) An absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal measures by the government decentralizing control of companies. De facto absence of central government control with respect to exports is based on two prerequisites: (1) Whether each exporter sets its own export prices independently of the government and other exporters; and (2) whether each exporter can keep the proceeds from its sales.

*Sparklers from the People's Republic of China,* 56 Fed.Reg. 20588, 20589, (Dep't Comm.1991) (final determination).

In *Sparklers,* Commerce assigned separate, company-specific margins for three PRC sparkler exporters. Each exporter introduced evidence to show that it set its own export prices. In addition, each company submitted its business license, along with explanations, published before the investigation began, of substantive implications of receiving a business license.

Similarly, Commerce has found de jure and de facto absence of central control where the exporter introduced its business license without restrictive stipulations, governmental regulations, copies of customer correspondence showing how sales prices were negotiated, a bank certificate demonstrating its separate business account, its corporate charter, and governmental certificates attesting to its independence. (*See Shop Towels of Cotton from the People's Republic of China,* 56 Fed.Reg. 60969 (Dep't Comm.1991) (final admin. review); *see also Certain Iron Construction Castings from the People's Republic of China,* 56 Fed.Reg. 37074 (Dep't Comm.1991) (prelim. admin. review) and *Certain Iron Construction Castings from the People's Republic of China,* 57 Fed.Reg. 10644 (Dep't Comm.1992) (final admin. review).

The court extensively examined the administrative record in the case at bar. While the record contained some evidence of absence of control by the PRC central government, the record did not include the breadth of information necessary to satisfy the guidelines as set forth in *Sparklers.* The record contained only a smattering of documents prepared by the PRC government officials, China National, or plaintiffs after the Petition was filed, which simply stated that plaintiffs and Henan were separate legal entities as of January 1, 1988.[2]

These documents alone, however, are not sufficient to show absence of central control because, unlike *Sparklers* or *Shop Towels,* no objective indications of de jure or de facto independence were submitted. The record contained neither business or export licenses, nor direct official evidence of legislation by the PRC government.[3] Nor did the record include sales correspondence, bank records, corporate credentials, or other neutral documentation prepared prior to the date of the Petition.[4] In fact,

---

**2.** A partial list of these documents includes a certificate issued by the China Council for the Promotion of International Trade, dated July 16, 1990; letters prepared by China National dated June 28, 1990, the PRC Embassy dated 1990, and Shandong and Tianjin both dated October 26, 1990; and an article concerning the 1988 PRC foreign trade reform.

**3.** Defendant and Woodings argue that plaintiffs' failure to produce the confidential Directive which decentralized PRC foreign trade corporations alone automatically supported a finding by Commerce that central control by the PRC government continued. However, the court finds that neither legal authority nor logic dictates such a litmus test. The inquiry is not whether a single document such as the Directive was produced. To the contrary, Commerce

must evaluate the record *in toto* to determine whether all of the introduced documents demonstrate absence of central control. *See Sparklers from the People's Republic of China,* 56 Fed.Reg. 20588, 20589, (Dep't Comm.1991) (final determination) ("Evidence supporting, though not requiring, a finding of de jure absence of central control includes ... (2) any legislative enactments decentralizing control of companies....").

**4.** The only pre-Petition document located by the court was a December 5, 1988 order from Shandong Foreign Trade Bureau which stated that *after* independence, Shandong *would be* "Shandong Machinery Import and Export Corporation" rather than the Shandong branch of China National. Further, Shandong was to begin im-

several documents in the record indicated that plaintiffs were not separate legal entities. In 1990, plaintiffs forwarded correspondence on China National letterhead, with plaintiffs described as "branches." (Public Reel at 137–140, 143, and 610.) Plaintiffs similarly received sales orders addressed to China National. (Public Reel at 552.)

Therefore, the courts finds that the record supports Commerce's determination that plaintiffs were not independent legal entities and were not entitled to separate, company-specific margins.

■ However, as their apparent backup argument, plaintiffs also contend that regardless of the fact that China National and plaintiffs provided insufficient data to demonstrate independence, Commerce was required to "seek out" information to resolve any questions regarding Tianjin's and Shandong's separation by conducting verification. In support, plaintiffs point to *Certain Headwear from the People's Republic of China*, 53 Fed.Reg. 45,138 (Dep't Comm.1988) (prelim. determination) where Commerce emphasized the importance of verifying the accuracy of a party's submissions to the record. In that action, verification revealed that, contrary to written submissions, an industry in the PRC remained state controlled.

■ However, the burden of creating an adequate record lies with respondents and not with Commerce. *Chinsung Indus. Co. v. United States*, 13 CIT 103, 705 F.Supp. 598 (1989). Commerce is required to verify factual information upon which the final determination relies. 19 U.S.C. § 1677e(b)(1) (1988); 19 C.F.R. § 353.36 (1992). "[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Industries v. United States*, 14 CIT ——, 733 F.Supp. 1507, 1508 (1990).

In this case, China National and plaintiffs did not meet their preliminary burden of creating an adequate record supporting a claim of independence. Therefore, Commerce was under no duty to conduct verification of such information. A requirement that Commerce must search out new information in the guise of "verification," as plaintiffs suggest, is really a mandate that Commerce must shoulder any burden that the plaintiffs choose not to meet.

The court concludes, therefore, that Commerce properly required China National to submit a consolidated response including information pertaining to Henan.

### 2. Technical Deficiencies in the Responses

■ The record also showed that information which China National did provide regarding Tianjin and Shandong was inaccurate and deficient. Due to these inadequacies in the responses, Commerce could not determine the factors of production necessary to calculate foreign market value. For example, the record demonstrated that, despite Commerce's request, China National failed to resolve discrepancies in the quantity and value of hammers/sledges, bars/wedges, and axes/adzes sales data reported in sections A and C of the questionnaire responses. (Public Reel at 1510.) Further, China National's responses failed to provide requested product-specific information on steel, production quantities by product, and specific distances from factories to ports. (Public Reel at 1502–1509.)

China National's improperly formatted computer diskettes also prevented Commerce from manipulating the submitted information. The problem was not cured by the reformatted diskettes, nor by the computer macro introduced after the deadline for data submissions had run. (Public Reel at 1512–1515.)

Consequently, the court finds that due to China National's failure to submit complete and accurate consolidated information concerning its Tianjin and Shandong branches, exclusion of data regarding its Henan

---

mediate proceedings for legal registration of its new name. (Public Reel at 974–976.) However, neither this document nor any other established that Shandong formally registered its new title, or that it exclusively used the name "Shandong Machinery Import and Export Corporation."

branch, and submission of defective computer diskettes, substantial evidence supported Commerce's decision to resort to BIA.

### 3. Choice of Information as BIA

Plaintiffs also contend that Commerce erred in its selection of the actual information to be used as BIA. Plaintiffs claim that Commerce improperly drew the adverse inference that China National and plaintiffs refused to provide the requested information because the data was unfavorable, rather than the proper assumption that the information was withheld because it was outside plaintiffs' control. Secondly, plaintiffs assert that Commerce abused its discretion by adopting information in the Petition as BIA, rather than more "accurate and independent" data introduced by China National.

■ It is long settled law that BIA is a rule of reasonable adverse inference. The purpose of BIA is to induce respondents, in the absence of agency subpoena power, to provide Commerce with timely factual information to facilitate the timely completion of administrative proceedings. *See Olympic Adhesives, Inc. v. United States,* 899 F.2d at 1565, *Tai Yang Metal Industrial Co., Ltd., v. United States,* 13 CIT 345, 712 F.Supp. 973 (1989).

In deciding what information to use as BIA, Commerce may take into account whether a party refuses to provide requested information or otherwise impedes the proceeding. 19 C.F.R. § 353.37(b) (1992). Commerce may determine "on a case-by-case basis, what the best information available is. In selecting a BIA rate, the statute and the implementing regulation direct [Commerce] to evaluate the nature of the information of the record, as well as the respondent's actions during the administrative proceeding." *Roller Chain, Other than Bicycle, from Japan,* 57 Fed.Reg. 6808, 6809 (Dep't Comm.1992) (final admin. review). When the use of BIA is challenged, "the question is not whether [Commerce] has chosen the "best" of all available information, but rather whether the information chosen by [Commerce] is supported by substantial evidence on the rec-

ord." *N.A.R.,* 741 F.Supp. at 942 (citations omitted). The material upon which Commerce may rely as BIA may be information submitted in support of the petition. *Id.* at 942, citing 19 C.F.R. § 353.51(b).

■ Here, the only information in the record was furnished by Woodings–Verona and China National. China National's submissions were incomplete and unreliable. Nevertheless, Commerce acknowledged China National's "attempt to cooperate" and rejected the use of the highest margins alleged in the Petition. *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China,* 56 Fed.Reg. 241, 245 (Dep't Comm.1991) (final determination). Therefore, the court finds that Commerce's use of BIA as an adverse inference and its reliance upon an adjusted average of the Petition's dumping margins as BIA were supported by substantial evidence.

### C. Calculation of Foreign Market Value

Next, plaintiffs challenge two aspects of the foreign market value calculation contained in the Petition that Commerce adopted as BIA.

The Petition stated that India was an appropriate surrogate country upon which to calculate foreign market value of the subject merchandise. When valuing factors of production, the Petition used Japanese steel export prices to the PRC for the cost of raw steel, and wage values for skilled Indian steel workers. Plaintiffs contend that Commerce should have used Indian steel prices and unskilled Indian labor rates submitted by China National when calculating foreign market value.

### 1. Use of Japanese Steel Export Prices

Title 19 United States Code, Section 1677b(c)(1) (1988) provides that when a non-market economy country is concerned, Commerce shall determine foreign market value

on the basis of the value of the factors of production utilized in producing the merchandise.... [T]he valuation of the factors of production shall be based on the

best available information regarding the values of such factors in a market economy country or countries considered to be appropriate....

In valuing factors of production under this section, 19 U.S.C. § 1677b(c)(4) (1988) mandates that Commerce:

shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—

(A) at a level of economic development comparable to that of the nonmarket economy country, and

(B) significant producers of comparable merchandise.

In calculating foreign market value, the Petition valued the PRC's cost of raw steel upon Japanese export prices of medium carbon round steel bars to the PRC because Indian information regarding comparable quality steel was not available. The remainder of the factors of production were valued according to Indian prices and costs.

Plaintiffs claim that Japanese export prices cannot be utilized because Japan is not a proper surrogate country for the PRC. Plaintiffs also argue that when Commerce uses a factors of production valuation, some factors cannot be valued upon surrogate country information, while others are based upon the price for steel actually paid by the PRC. Finally, they contend that because the manufacture of the subject merchandise did not use Japanese steel, Japanese prices are irrelevant and Indian steel bar prices should have been used instead. Moreover, if cost information for Indian steel was unavailable, Commerce had a duty to affirmatively locate additional surrogate information.

■ Plaintiffs' first assertion that Commerce effectively treated Japan as a surrogate country must be dismissed out of

hand. Commerce did not value a PRC factor of production based upon the cost of an analogous production factor in Japan. It simply replaced the surrogate-based value for raw steel with the PRC manufacturer's true cost of steel.[5]

■ Plaintiffs' second challenge is also unfounded. When valuing factors of production in a nonmarket economy, Commerce has determined that foreign market value can be most accurately calculated by first valuing the factors of production on the basis of prices paid by the nonmarket economy country to market-economy suppliers before resorting to surrogate values. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the Republic of Hungary*, 55 Fed.Reg. 21066, 21067 (Dep't Comm.1990) (final admin. review); *see also Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed.Reg. 55271 (Dep't Comm.1991) (final determination). More specifically, in *Sparklers from the People's Republic of China*, 56 Fed.Reg. 20588, 20590 (Dep't Comm.1991) (final determination), Commerce recently expressed its hierarchy of cost information used to value factors of production:

(1) Prices paid by the [nonmarket economy] for items imported from a market economy; (2) prices in the primary surrogate country of domestically produced or imported materials; (3) prices in one or more secondary surrogate countries reported by the industry producing subject merchandise in the secondary country or countries; and (4) prices in one or more secondary surrogate countries from sources other than the industry producing the subject merchandise.

In this case, exercising the first option spelled out in *Sparklers*, Commerce valued raw steel inputs based upon the price that

---

5. In conjunction with their claim that Commerce used Japan as a surrogate market economy country, plaintiffs also argued that Commerce failed to adjust the prices of Japanese raw steel bars pursuant to 19 C.F.R. § 353.-52(b)(2). Section 353.52(b)(2) of Title 19 Code of Federal Regulations (1992) provides that when a surrogate is at a different stage of eco-

nomic development than the country under investigation, Commerce must make adjustments for "known differences in the costs of material and fabrication". Because Commerce did not use Japan as a surrogate market economy country, Commerce need not adjust the prices of its exported raw steel bars.

the PRC actually paid to Japan, a market economy country. In the absence of evidence of the actual prices paid by the PRC for the remaining factors of production, Commerce valued those factors according to costs in the surrogate country of India.

Nothing in the Tariff Act of 1930, as amended (19 U.S.C. §§ 1202 *et seq.* (1988, Supp. I 1989 & Supp. II 1990) or its legislative history mandates that Commerce must derive foreign market values exclusively from either actual prices paid by the nonmarket economy, or from surrogate-based values. Title 19 United States Code, Section 1677b(c)(1) (1988) provides simply that "valuation of the factors of production shall be based on the *best available information*" regarding values in a surrogate country. (Emphasis added.) Additionally, Commerce shall only utilize "to the extent possible" the prices or costs in the surrogate country. 19 U.S.C. § 1677b(c)(4) (1988).

Moreover, Commerce's ability to construct foreign market value from weighted alternatives advantageously serves the antidumping statute's purpose of "determining current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States*, 8 Fed.Cir. (T) ——, 899 F.2d 1185, 1191 (1990). Specifically, Commerce's task in a nonmarket economy investigation is to calculate what a producer's costs or prices would be if such prices or costs were determined by market forces. As Commerce incisively stated in *Oscillating Fans and Ceiling Fans from the People's Republic of China*, 56 Fed.Reg. 55271, 55275 (Dep't Comm.1991) (final determination):

[r]equiring the use of surrogate values in a situation where actual market-based prices incurred by a particular firm are available would be contrary to the statutory purpose. Where [Commerce] can determine that [a nonmarket economy] producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law.

In addition, the goals of accuracy, fairness, and predictability should apply whether a country's economy is market or nonmarket oriented. In antidumping proceedings concerning imports from market economy countries, [Commerce] uses the price of imported inputs when calculating [foreign market value] using constructed value methodology. The fact that it is more accurate to use an actual input value for merchandise sourced from a third country should not change simply because the country under investigation is [a nonmarket economy]. Different treatment of an imported input based solely on whether the input is imported into a market or nonmarket economy country is illogical.

■ The court finds, therefore, that Commerce may use evidence of prices paid by the nonmarket economy country to market-economy suppliers in combination with surrogate country information when valuing factors of production. Accordingly, the court must next address plaintiffs' final concerns, whether substantial evidence supports Commerce's determination that the PRC imported steel from Japan and whether evidence of Indian steel bar prices or information from another surrogate should have been used as BIA instead.

The record contains substantial evidence that the PRC imported steel bars from Japan, and of the price paid by the PRC for steel. The Petition stated that its calculations were based upon Japanese export prices for steel bars to the PRC as reported in official Japanese export statistics. (Public Reel at 56.) China National indicated that it used steel imported from Japan in manufacturing the subject merchandise. (Public Reel at 717, 730–742.) In its Tianjin questionnaire response, China National stated that steel used in the subject merchandise production process was "imported from Italy, West Germany, *Japan* and Czechoslovakia" until 1988. (Public Reel at 1095) (emphasis added).

A review of the record also supports Commerce's findings that the Indian steel bar prices were too inexact to be usable. The proposed information from India was

an average of several different types and sizes of selected Indian steel products, (Public Reel at 1419–1423), while the Petition used actual statistics for Japanese exports to the PRC of the same type and size of steel used in the manufacture of the subject merchandise. (Public Reel at 56, 147–154.)

Lastly, when valuing factors of production in a nonmarket economy investigation, Commerce has no affirmative mandate to finish plaintiffs' homework by locating *additional*, but perhaps more favorable, surrogate information that China National neglected to find. Title 19 United States Code, Sections 1677b(c)(2) (1988) and 1677b(c)(4) (1988) in conjunction provide only that Commerce "shall determine" to the extent possible foreign market value from the value of factors of production in a surrogate country. Respondent, rather than Commerce, has the burden of creating an adequate record. *Chinsung Indus. Co. v. United States*, 13 CIT at 103, 705 F.Supp. 598.

Therefore, the court finds that Commerce's use of Japanese export prices of steel bars to the PRC in its calculation of foreign market value was based upon substantial evidence.

### 2. Use of Skilled Indian Steel Worker Wages

██ Next, plaintiffs assert Commerce's adoption as BIA of wage values for skilled steel workers listed in the Petition was not supported by substantial evidence. The Petition based its calculation of foreign market value, in part, on minimum monthly wages for skilled Indian steel workers. Plaintiffs claim that the subject merchandise is produced by unskilled labor. Consequently, Commerce should have calculated the unskilled wage rates using unskilled wage values contained in China National's questionnaire responses, along with publicly available unskilled Indian monthly wage information. (Public Reel at 1446, 1447.)

Commerce has discretion in its selection of information to be used as BIA. The information ultimately selected by Commerce as BIA "is not necessarily accurate information, it is information which be-

comes usable because a respondent has failed to provide accurate information." *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 28, 704 F.Supp. 1114 (1989), *aff'd*, 8 Fed.Cir. (T) ——, 901 F.2d 1089 (1990) (citations omitted).

Commerce's adoption of the skilled labor wages listed in the Petition is supported by substantial evidence. The Petition stated that Woodings–Verona utilized skilled labor operating automated machinery when manufacturing heavy forged hand tools. It calculated labor rates based upon the number of hours required for skilled labor to produce the merchandise. However, the evidence showed that a greater number of man-hours were required to fabricate the product in the PRC and India because those manufacturers apparently employed unskilled laborers to perform tasks that Woodings–Verona automated. Therefore, use of Indian unskilled labor rates to value the fewer number of work hours required for skilled workers operating automated equipment to manufacture merchandise would arbitrarily skew the Petition's methodology while significantly underestimating labor costs. (Public Reel at 59–60.) Commerce consequently properly used skilled labor rates when calculating foreign market value.

### D. Denial of Final Determination Postponement Request

██ Plaintiffs also challenge Commerce's denial of the request by China National for postponement of the final determination.

Section 1673d(a)(2) of Title 19 United States Code (1988) provides that Commerce "may" postpone making the final determination if a written request is made. Its implementing regulation, 19 C.F.R. § 353.-20(b)(1) (1992), states that Commerce "will postpone the final determination ... unless [Commerce] finds compelling reasons to deny the request."

China National requested a postponement to provide Commerce with ample time to conduct verification and to "adequately consider all of the issues" raised in the

briefs opposing Commerce's "sole reliance on allegations in the Petition as best information available." (Public Reel at 1719, 1722.) In the final determination, Commerce responded that because it rejected China National's questionnaire responses as incomplete and inaccurate, verification was inappropriate and it denied the postponement request.

■ The court finds that Commerce's denial of the postponement request was based upon substantial evidence. In antidumping inquiries, Commerce is charged with resolving investigations accurately and quickly. *See Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 744 F.2d 1556 (1984). Commerce properly rejected China National's questionnaire responses and declined to conduct verification. As a result, a postponement to permit verification was unwarranted.

Plaintiffs' other grounds for challenging the postponement denial are likewise insufficient. Additional time to consider legal arguments raised in the briefs would not have altered Commerce's findings because Commerce properly relied upon the information contained in the Petition as BIA. Further, China National could not present supplementary factual arguments because the deadline for factual submissions had passed. *See* 19 C.F.R. § 353.31 (1992). Consequently, the determination by Commerce that compelling reasons existed to deny China National's postponement request was based upon substantial evidence.

### E. Standing to File the Petition

Finally, plaintiffs assert that Commerce erred by failing to dismiss those aspects of the Petition regarding hewing tools since the Petition was not filed "on behalf of" a domestic industry.[6] Plaintiffs contend that a significant portion of the industry did not support the Petition. As proof of its position, plaintiffs relied upon an opposition to the Petition filed by Mann Edge with Commerce on December 14, 1990. In its opposition letter, Mann Edge stated that its share of the United States market for heavy

striking tools was approximately 27 percent. Plaintiffs argued that based on Mann Edge's opposition, Commerce should have dismissed the Petition outright. Or, Commerce at a minimum must investigate whether or not the Petition was supported by a sufficient segment of the industry. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660 (Fed.Cir.1992) and *NTN Bearing Corp. of America v. United States*, 15 CIT ——, 757 F.Supp. 1425 (1991).)

Plaintiffs challenged Woodings–Verona's standing to bring the Petition on behalf of an industry for the first time on appeal to this court. Defendant and Woodings–Verona asserted that any challenge to standing in the Petition must have been raised during the administrative proceedings before Commerce, which plaintiffs failed to do. Defendant and Woodings–Verona point to long settled law that "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n of Alaska v. Argon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946). "[T]o preserve an issue for judicial review it must have been raised at the administrative level 'at the time appropriate under [the agency's] practice.'" *Al Tech Specialty Steel Corp. v. United States*, 11 CIT 372, 376, 661 F.Supp. 1206 (1987) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

However, plaintiffs justified their delay in raising this objection on the ground that the lateness of Mann Edge's submission precluded a timely challenge before Commerce. Alternatively, they contended that a challenge to standing, similar to a claim of absence of judicial subject matter jurisdiction, materially affected Commerce's jurisdiction and cannot be waived. (*See Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir.1988).)

**6.** Title 19 of United States Code, Section 1673a(b) (1988) requires that an antidumping petition must be filed "on behalf of an industry".

The first issue that this court must address is whether the belated filing of an opposition by Mann Edge reasonably prevented plaintiffs from timely raising the standing issue during the administrative proceedings before Commerce. Mann Edge's opposition was submitted little more than two weeks before Commerce issued its final determination. The record did not indicate that Commerce notified plaintiffs prior to the final determination of any standing determination it made, or any action, such as an investigation, it would take as a result of Mann Edge's opposition.

Consequently, the court finds that in light of the late opposition filed by Mann Edge, plaintiffs could not reasonably have challenged Woodings–Verona's standing during the administrative proceedings before Commerce. Because the court determines that plaintiffs properly raise the issue now, the court must next determine whether substantial evidence supports Commerce's determination concerning standing.

The final determination was silent on the issue of Woodings–Verona's standing to bring the Petition. The final determination ignored the opposition filed by Mann Edge entirely and provided no indication as to why Commerce did so. For example, Commerce did not elucidate whether the opposition was disregarded because it was introduced after the regulatory deadline for submission of standing challenges.[7] Similarly, Commerce failed to indicate whether it determined that only a timely filed opposition would compel Commerce to investigate the petitioner's standing. If, in fact, Commerce adopted this position, then it failed to support its implicit finding that the petitioner's standing to file the petition on behalf of the industry is not a fundamental jurisdictional requirement that is challengeable at any time.

As a result of Commerce's failure to provide any indication of the course of conduct it pursued after receiving Mann Edge's opposition, the Court finds that Commerce's determination regarding standing is not supported by substantial evidence. The court accordingly grants plaintiffs' request for remand to Commerce. Upon remand, Commerce is instructed to specify the course of conduct taken as a result of the opposition filed by Mann Edge, in addition to the underlying reasons for its determination.

## CONCLUSION

For the reasons provided above, this court holds that Commerce's final determination regarding sales at less than fair value of heavy forged hand tools, including hammers/sledges, bars/wedges, picks/mattocks, and axes/adzes from the PRC was, in part, supported by substantial evidence and in accordance with law. Accordingly, Commerce's determination is sustained in part, and plaintiffs' motion for remand is granted in part.

---

**7.** Title 19 of Code of Federal Regulations, Section 353.31(c)(2) (1992) provides that Commerce "will not consider any allegation in an investigation that the petitioner lacks standing unless the allegation is submitted, together with supporting factual information, not later than 10 days before the scheduled date for the Secretary's preliminary determination."