## Slip Op. 01-03

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____ :
                                     :
ALLIED TUBE AND CONDUIT CORP.,       :
                                     :
        Plaintiff,                   :
                                     :
        v.                           :
                                     :  Court No. 99-11-00715
THE UNITED STATES,                   :
                                     :  **Public**
        Defendant,                   :  **Version**
                                     :
        and                          :
                                     :
SAHA THAI STEEL PIPE CO., LTD.,      :
ET AL.,                              :
                                     :
        Defendant-Intervenors.       :
_____ :

[ITA's antidumping determination affirmed in part and remanded in part.]

Dated: January 18, 2001

Schagrin Associates (Roger B. Schagrin) for plaintiff.

David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michele D. Lynch), Brian K. Peck, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

O'Melveny & Myers LLP (Peggy A. Clarke and Greyson Bryan) for defendant-intervenors Saha Thai Steel Pipe Co., Ltd., Ferro Union, Inc., and Asoma Corporation

## OPINION

**RESTANI, Judge:**  This matter is before the court on a motion for judgment on the agency record pursuant to USCIT Rule 56.2, brought by Allied Tube and Conduit Corp. ("Allied Tube" or "plaintiff"), the petitioner in the underlying antidumping administrative review.  Defendant-intervenors Saha Thai Steel Pipe Co., Ltd. ("Saha Thai" or "respondent"), Ferro Union, Inc., and Asoma Corporation (collectively "defendant-intervenors") appear in order to support the determination of the United States Department of Commerce ("Commerce" or the "Department") in the underlying administrative proceeding.  At issue is Certain Welded Carbon Steel Pipes and Tubes from Thailand, 64 Fed. Reg. 56,759 (Dep't Comm. 1999) (final determ.) [hereinafter "Final Results"].

Allied Tube challenges two of the Department's conclusions from the Final Results:  (1) that the date of sale on which normal value is to be determined for Saha Thai's sales is the invoice date, and (2) that Saha Thai is entitled to a duty drawback adjustment to its export price, at an amount quantified based on the Department's selection of facts available.  Commerce and defendant-intervenors urge this court to deny plaintiff's motion based on the following:  (1) plaintiff's challenge to the

identification of invoice date as the date of sale cannot overcome the agency's regulatory presumption in favor of invoice date, and (2) Saha Thai satisfied the Department's two-prong test for entitlement to duty drawback, notwithstanding certain of Saha Thai's inaccuracies, which were addressed in any event by Commerce's use of facts otherwise available.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). In reviewing final determinations in antidumping duty investigations, this court will hold unlawful those determinations of Commerce found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

**DISCUSSION**

**I. Date of Sale**

**A. Facts**

In response to the Department's initial questionnaire regarding the date of sale for Saha Thai's U.S. sales, respondent submitted to Commerce a representative group of sales documents. See Supplement to Section A Questionnaire Response (July 1,

1998), at Exh. 12, C.R. Doc. 3, Saha Thai App., Tab A.  Saha Thai

reported invoice date as the date of sale.  See Section C

Questionnaire Response (Aug. 3, 1998), at C-16 to 17, C.R. Doc.

7, Saha Thai App., Tab B, at C-16 to 17.  Responding to an

additional request for information regarding date of sale, Saha

Thai reported that for sales to the company's principal U.S.

customer, which accounted for two-thirds of U.S. sales,

> the contract notes only the total quantity to be
> ordered.  The specific quantity for each product is set
> subsequently.  The exact quantity for each sale is not
> determined until the merchandise is shipped.

Supplemental Questionnaire Response (Sept. 23, 1998), at 13, C.R.

Doc. 14, Def.'s App., Exh. 2, at 2.

The Department conducted a verification of Saha Thai's

questionnaire responses during the week of January 25, 1999.  See

Verification Report (Feb. 25, 1999), at 1, C.R. Doc. 22, Saha

Thai App., Tab E, at 1.  Commerce confirmed during verification

that Saha Thai's business records identified invoice date as the

date of sale.  See id. at 13, Saha Thai App., Tab E, at 13.

Respondent also produced exhibits, reviewed by the Department,

that included contracts, invoices and purchase orders for certain

U.S. sales.  See Verification Exhs. 21, 22, 23, in Pl.'s App., at

74-108, 109-123, 124-135, respectively.  In response to

Department questions about the export sales process, Saha Thai's

export manager noted that the sales contracts establish
quantities, but that customers submit purchase orders that
indicate specific quantities to be supplied for each product and
shipment.  See Verification Report, at 20, Saha Thai App., Tab E,
at 20.  The sales contracts allow for deviations from the
specified quantity of up to X %,[1] measured against the total
quantity of goods in a purchase order (covering subject and non-
subject merchandise), not against the quantity for individual
products or shipments.  See id. at 20, Saha Thai App., Tab E, at
20.

Based on its evaluation of Saha Thai's sales documentation,
viewed in the context of the specific terms of respondent's sales
contracts, the Department concluded that changes in material
terms of sale, particularly quantity, occurred between purchase
order date and invoice date.  See Final Results, 64 Fed. Reg. at
56,768.

---

[1]    "X" represents the [    ]% tolerance figure specified
in the sales contracts.

**B.   Analysis**

The Department's date of sale determination is governed by 19 C.F.R. § 351.401(i) (2000).[2]  Section 351.401(i) provides that Commerce will "normally" use the invoice date as the date of sale.  A party seeking to have the invoice date deemed the date of sale is entitled to this regulatory presumption only if that party records the invoice date as the date of sale in the company's "records kept in the ordinary course of business."  Id. Once a party's records reveal that it identifies the invoice date as the date of sale, the party seeking to establish a date of sale other than invoice date bears the burden of producing sufficient evidence to "satisf[y]" the Department that "a different date better reflects the date on which the exporter or producer establishes the material terms of sale."  Id.

As elaborated by Department practice, a date other than invoice date "better reflects" the date when "material terms of sale" are established if the party shows that the "material terms of sale" undergo no meaningful change (and are not subject to meaningful change) between the proposed date and the invoice

---

2    Allied Tube also challenges the Department's date of sale regulation as ultra vires because it is inconsistent with the antidumping statute and the Statement of Administrative Action, accompanying H.R.Rep. No. 103-826(I), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA").  This argument has been considered and rejected by this court in Allied Tube and Conduit Corp. v. United States, No. 98-11-03135, Slip Op. 00-160, at 19-23 (Ct. Int'l Trade Dec. 12, 2000).

date.  See, e.g., Issues & Decision Mem. to Certain Large
Diameter Carbon and Alloy Seamless Standard, Line and Pressure
Pipe from Mexico, 65 Fed. Reg. 39,358 (Dep't Comm. June 2000)
(final determ.), at cmt. 2 [hereinafter "Issues Mem. to Pipe from
Mexico"]; Issues & Decision Mem. to Circular Welded Non-Alloy
Steel Pipe from Mexico, 65 Fed. Reg. 37,518 (Dep't Comm. June
2000) (final determ.), at Hylsa cmt. 1.  Whatever else may
constitute "material terms of sale," agency practice makes clear
that price and quantity, at least, are such "material terms."
See, e.g., Stainless Steel Sheet and Strip in Coils from the
Republic of Korea, 64 Fed. Reg. 30,664, 30,679 (Dep't Comm. 1999)
(final determ.); Stainless Steel Sheet and Strip in Coils from
Taiwan, 64 Fed. Reg. 30,592, 30,609 (Dep't Comm. 1999) (final
determ.).  Therefore, if there is a change in price and/or
quantity after the proposed date, and the Department fails to
provide a rational explanation as to why such a change is not
meaningful for date of sale analysis, then Commerce is bound
under the regulation to employ invoice date as the date of sale.
See Thai Pineapple Canning Indus. Corp., Ltd. v. United States,
No. 98-03-00487, 2000 WL 174986, at *2 (Ct. Int'l Trade 2000).

    Plaintiff in this case failed to cite sufficient evidence to
compel a rejection of the regulatory presumption in favor of
invoice date as the date of sale.  Respondent Saha Thai's

internal business records, as verified by the Department, identified the date of sale to be the invoice date.  See Verification Report, at 13, Saha Thai App. Tab E, at 13.  The presumption in favor of the invoice date was further strengthened by the changes in quantity observed by the Department between the purchase order date and the invoice or shipment date.[3]  See Date of Sale Memo (Aug. 11, 1999), at 3-4, C.R. Doc. 34, Pl.'s App., at 54-55.

Plaintiff emphasizes previous agency determinations suggesting that the date of sale may be other than the invoice date, notwithstanding changes in quantity, based on the fact that such quantity changes fell within tolerance limits specified in the relevant sales contracts.  See Issues Mem. to Pipe from Mexico, at cmt. 2; Certain Welded Carbon Steel Pipes and Tubes from Thailand, 63 Fed. Reg. 55,578, 55,588 (Dep't Comm. 1998) (final determ.).  These findings do not dictate a similar result here, however, because plaintiff has not cited evidence

---

[3]     Plaintiff challenges the Department's reliance on changes in quantity as calculated from incomplete documentation provided in Verification Exhibit 23, in particular, the absence of a complete purchase order.  See Verification Exh. 23, in Pl.'s App., at 124-135.  The type of documentation required varies from investigation to investigation.  Whether judged in hindsight a different investigation would have been more enlightening, here plaintiff has failed to establish that Commerce did not perform its core investigatory duties adequately.  See infra discussion in text.

establishing that the quantity changes between the purchase order
date and the invoice date in this case were within the sales
contracts' tolerance limits.  Calculating Saha Thai's shipments
of individual products (i.e., subject merchandise) to be within X
% of the amount specified in the sales contracts and purchase
orders,[4] plaintiff argues that the changes in quantity relied
upon by the Department are within the tolerance limits permitted
by the contracts and therefore should not be considered
meaningful changes for purposes of the agency's date of sale
determination. The sales contracts, however, permitted shipments
within X % of the contractually-specified quantity, measured in
terms of all products in a purchase order (including subject and
non-subject merchandise), not in terms of quantity per shipment
of individual products.[5]  See Verification Report, at 20, Saha
Thai App., Tab E, at 20.  Because plaintiff failed to establish
that the quantities shipped by respondent were within the
tolerance limits, when viewed against the aggregate quantity per
purchase order, plaintiff did not "satisf[y]" the Department that

---

[4]     See supra n.1.

[5]     Although the contracts covered subject and non-subject
merchandise, none of the parties has established that the
malleability of the contractual situation turned on the type of
merchandise covered.

a date other than invoice date "better reflect[ed]" the date of sale.

By placing on plaintiff the burden to cite to evidence comparing the changes in quantity against the aggregate quantity per purchase order, the court essentially may be requiring plaintiff in this case to ensure that a complete set of invoices for each sales contract is in the record. Such evidence, understandably, is uniquely within the control of respondent. The court recognizes that, in this case, plaintiff therefore could not have placed the requisite evidence on record by its own submissions. Nevertheless, plaintiff could have taken the steps necessary to ensure the placement of such evidence on the record, for example, by requesting the Department to obtain the documentation from the respondents.

Even though the Department and plaintiff were unaware until verification that the tolerance limits were measured against the total quantity on a purchase order, the Department is capable of seeking additional information from respondents through requests made during verification or supplemental questionnaires issued after verification. See, e.g., Dynamic Random Access Memory Semiconductors of One Megabit and Above ("DRAMs") from Taiwan, 64 Fed. Reg. 56,308, 56,310 (Dep't Comm. 1999) (final determ.) (two supplemental questionnaires issued after sales verification);

Stainless Steel Plate in Coils ("SSPC") from the Republic of Korea, 64 Fed. Reg. 15,444, 15,450 (Dep't Comm. 1999) (final determ.) ("During the course of verification, it is normal for the Department to request additional information or documentation from a respondent."); Sulfanilic Acid from the People's Republic of China, 63 Fed. Reg. 63,834, 63,836 (Dep't Comm. 1998) (final determ.) (supplemental questionnaire issued after verification). Plaintiff could have made the request for the desired information in post-verification comments.[6]  Plaintiff does not claim that it made such a request of the Department, and the court has found no evidence of such a request in its review of the record.  Although the investigatory nature of the proceeding places the burden of the core of the investigation on Commerce, the parties do guide the process and must alert the agency to matters which they believe require unusually detailed inquiry.

In any event, even if plaintiff were correct that quantity changes under the sales contracts at issue should be evaluated based on shipments of individual products, rather than on the aggregate quantity of products per purchase order, invoice date

---

[6]     In fact, plaintiff in this case did submit such post-verification comments on Saha Thai's verification responses "in anticipation of the Department's preliminary results," but plaintiff's comments did not include a request for additional invoices.  Petitioners' Post-Verification Comments On Saha Thai, at 1, C.R. Doc. 23.

would remain the proper date of sale.  A comparison of a purchase order and corresponding invoice from Verification Exhibit 21 revealed a percentage change in quantity far in excess of the contractually-specified tolerance limit.[7]  See Date of Sale Memo, at 3, C.R. Doc. 34, Pl.'s App., at 54.  Given the regulatory presumption favoring the use of invoice date, the existence of this one sale beyond contractual tolerance levels suggests sufficient possibility of changes in material terms of sale so as to render Commerce's date of sale determination supported by substantial evidence.

Accordingly, the court finds that the agency was entitled to apply its regulation and allow date of invoice to constitute date of sale.

## II.  Duty Drawback

### A.  Facts

Saha Thai claimed a duty drawback adjustment to export price in its initial and supplemental questionnaire responses, identifying its participation in a cash-based and a guarantee-

---

[7]      The Department identified a quantity change of [      ]%, whereas, as discussed above, the contract permitted a variance of only [    ]% from the quantities ordered.  See Date of Sale Memo, at 3, Pl.'s App., at 54.

based duty drawback program in Thailand.  See Section C Questionnaire Response, at C-33, Saha Thai App., Tab B, at C-33; Supplemental Questionnaire Response (Sept. 23, 1998), at 27-28, Saha Thai App., Tab C, at 27-28.  Respondent calculated the drawback adjustment to which it claimed it was entitled by dividing the total amount of drawback received for each invoice by the number of tons exported.  See Section C Questionnaire Response, at C-33, Saha Thai App., Tab B, at C-33; Supplemental Questionnaire Response (Sept. 23, 1998), at 28, Saha Thai App., Tab C, at 28.  Supporting documentation submitted with the original and supplemental questionnaire responses, including import reports and export reports, identified the quantities of inputs imported, duties paid thereon or exempted therefrom, quantities of subject merchandise subsequently exported, and total drawback amounts granted by the Thai Government.  See Section C Questionnaire Response, at Exh. C-3, Saha Thai App., Tab B-3; Supplemental Questionnaire Response (Sept. 23, 1998), at Exh. SR2-23, Saha Thai App., Tab C-23.

At verification, reviewing import documentation related to Saha Thai's duty drawback claims, the Department identified certain discrepancies between amounts claimed for cash drawback and what was reported in the documentation presented.  See Verification Report, at 15, Saha Thai App., Tab E, at 15.

Commerce also asked respondent at verification to provide evidence of duties having been paid with regard to one particular purchase of imported inputs, but Saha Thai offered multiple, inconsistent responses during the course of verification.  See Duty Drawback Memo (Aug. 11, 1999), at 2-3, C.R. Doc. 35, Def.'s App., Exh. 3, at 2-3.

In light of these difficulties at verification, Commerce denied the duty drawback adjustment in the preliminary results. See Certain Welded Carbon Steel Pipes and Tubes from Thailand, 64 Fed. Reg. 17,998, 18,000 (Dep't Comm. 1999) (prelim. determ.). Before publication of the final determination, Commerce reviewed the additional documentation submitted by Saha Thai during verification and with respondent's case brief to the Department. After this review, and in light of the agency's familiarity from previous reviews with respondent's duty drawback adjustments and the Thai duty drawback system in general, the Department granted Saha Thai's request for a duty drawback adjustment.  See Final Results, 64 Fed. Reg. at 57,761-63.  Because of the inconsistencies discovered during verification, however, Commerce did not accept the drawback amount calculated by Saha Thai; rather, the agency relied upon facts otherwise available in calculating the precise amount of the duty drawback adjustment. See id.  The result of the Department's application of facts

available granted Saha Thai a larger duty drawback adjustment than that derived from respondent's proffered (and rejected) data.  See Def.'s Supp. Br. at 18.

**B.  Analysis**

A respondent seeking a duty drawback adjustment may base its claim on a foreign government program that either provides respondent with a rebate for import duties, or grants to respondent an exemption from import duties, for imported merchandise that is subsequently exported.  19 U.S.C. § 1677a(c)(1)(B).  In order to determine whether respondent is entitled to a duty drawback adjustment, Commerce has employed a two-prong test:

> (1)  Are the rebate and import duties dependent upon one another, or in the context of an exemption from import duties, is such an exemption linked to the exportation of the subject merchandise?

> (2)  Did respondent establish a sufficient amount of raw inputs imported to account for the level of duty drawback received for the exported product?

See Carbon Steel Wire Rope from Mexico, 63 Fed. Reg. 46,753, 46,756 (Dep't Comm. 1998) (final determ.); Certain Welded Carbon Standard Steel Pipes and Tubes From India, 62 Fed. Reg. 47,632,

47,635-36 (Dep't Comm. 1997) (final determ.).  As with all favorable adjustments to normal value or export price, respondent bears the burden of establishing both prongs of the test, and therefore, its entitlement to a duty drawback adjustment.  See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1040 (Fed. Cir. 1996) ("Commerce has reasonably placed the burden to establish entitlement to adjustments on [respondent], the party seeking the adjustment and the party with access to the necessary information."); Primary Steel, Inc. v. United States, 17 CIT 1080, 1090, 834 F. Supp. 1374, 1383 (1993) ("The burden of creating a record from which the ITA could determine whether [respondent] was entitled to a duty drawback adjustment rested with [respondent], not Commerce.").

### 1.  Entitlement to Duty Drawback

Plaintiff initially contests the Department's grant of a duty drawback adjustment based on Saha Thai's reliance on a cash-based and a bank guarantee-based program of duty drawback. Plaintiff concedes that the cash-based program satisfies the first prong of the Department's test.  Plaintiff argues that the description of the guarantee-based program provided by Saha Thai in its original questionnaire responses, on the other hand, is insufficient to satisfy the requirements of the first prong,

particularly as key supporting documentation was not supplied by respondent until after verification, in its case brief to the agency.

Contrary to plaintiff's suggestion, the Department is not precluded from accepting and considering respondent's post-verification submission of additional detailed information regarding the requirements for the duty drawback programs at issue.  Plaintiff effectively seeks to transform respondent's obligation to "creat[e] an adequate record," Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992), into a limitation on the scope of the record. Cf. 19 U.S.C. § 1516a(b)(2)(A) (identifying record upon which judicial review is based as "a copy of all information presented to or obtained by [the Department] during the course of the administrative proceeding").  Saha Thai's submission permitted the agency and plaintiff sufficient opportunity to respond to and rebut the information provided, if possible.  This opportunity is particularly available where, as here, the additional information provided is not of a complex or technical nature, but is simply a publicly-available statement of the Thai Government's duty drawback policy.  See Thai Regulations Governing Drawback, Case Brief of Saha Thai (May 14, 1999), at Attch. 2, P.R. Doc. 89, Saha Thai App., Tab G-2.  Such a statement issued by the foreign

political organ responsible for the administration of that country's duty drawback program is sufficient, by itself, to sustain the Department's determination that the first prong of its duty drawback test had been satisfied.  See Huffy Corp. v. United States, 10 CIT 214, 218-19, 632 F. Supp. 50, 54-55 (1986).

Plaintiff next contests the compliance of the cash-based and guarantee-based programs with the second prong of the Department's duty drawback test.  Plaintiff claims that respondent provided insufficient evidence to substantiate the quantification of its duty adjustments.  In Exhibit C-3, attached to Saha Thai's Section C Questionnaire Response, respondent provided an import report detailing the importation of certain inputs used in the manufacture of the subject merchandise at issue, particularly the amount of import duties paid.  See Section C Questionnaire Response, at Exh. C-3, Saha Thai App., Tab B-3; Supplemental Questionnaire Response (Sept. 23, 1998), at Exh. SR2-23, Saha Thai App., Tab C-23.[8]  The same exhibit included an export report that identified duty drawback amounts, labeled according to whether the drawback was in the form of a

---

[8]     At the Department's request, plaintiff re-submitted with its September 23, 1998 Supplemental Questionnaire Response, a more legible copy of the documents that had been provided in Exhibit C-3 to the August 3, 1998 Section C Questionnaire Response.  See Supplemental Questionnaire Response (Sept. 23, 1998), at 27, Saha Thai App., Tab C, at 27.

cash rebate (noted by a "C") or a guarantee (noted by a "G").

See id.  The export report revealed a total amount in duty

drawback equal to the amount of import duties specified in the

import report.  See id.  Import and export reports provided by

respondent as verification exhibits are similarly reconciled,

establishing that the imported raw inputs give rise to sufficient

import duties to equal the documented duty drawback amounts.[9]

See Verification Exh. 9, in Pl.'s App., at 65, 69-70, 73.  The

cash- and guarantee-based drawback programs thus satisfy both

prongs of the Department's duty drawback test and entitle Saha

Thai to the corresponding adjustment in export price.

### 2.  Amount of Duty Drawback:  Facts Available

---

[9]     Plaintiff also argues that Saha Thai's occasional failure to meet the requirements of the cash-based program warrants a presumptive finding that Saha Thai similarly fails occasionally to meet the requirements of the guarantee-based program.  In the absence of data from which the Department could conclude that Saha Thai always met its bank guarantee obligations, urges Plaintiff, respondent should be found to have failed to satisfy the second prong of the Department's duty drawback test.  Plaintiff is correct to rely on this court's caselaw squarely placing on respondent the burden to establish entitlement to a favorable adjustment.  Respondent has satisfied its initial burdens of production and persuasion here, however, in light of the above-cited evidence matching the duties paid on imports of inputs with the duty drawback amounts authorized by the Thai Government upon export of the subject merchandise. Given the evidence on record, therefore, the Department could reject the presumption proposed by plaintiff to evaluate the guarantee-based program.

Notwithstanding the fact that both programs satisfied the Department's two-prong test, Commerce found insufficient data or inaccuracies in the record that mandated the application of facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(2)(D). Regarding the bank guarantee drawback claim, Saha Thai failed to account for the fees the company must have paid to the bank in return for assuming the risk of guaranteeing Saha Thai's import duties. See Duty Drawback Memo, at 4, Def.'s App., Exh. 3, at 4. Facts available were employed in determining the appropriate adjustment under the cash-based program because certain statements and representations made by Saha Thai employees undercut the otherwise straightforward supporting documentation placed on the record by respondent. See id. at 2-4, Def.'s App., Exh. 3, at 2-4. Even if Saha Thai were entitled to a duty drawback adjustment, plaintiff argues, the Department erred because it applied facts otherwise available improperly when calculating the amount of adjustment for duty drawback.

Because of concerns as to the validity of the actual drawback amounts provided by Saha Thai, the Department calculated new drawback amounts using facts available. See id. at 4, Def.'s App., Exh. 3, at 4. The Department began with figures provided by Saha Thai that reflected duty drawback amounts per ton calculated for each of [    ] invoices (i.e., those sales for

-21-

which Saha Thai had claimed duty drawback).  A simple average was then taken of these [    ] numbers to produce an average duty drawback per ton for the relevant sales.  This average functioned as the modified drawback adjustment to export price, replacing the duty drawback amounts claimed by Saha Thai.  See id. at 4 & Attachment, Def.'s App., Exh. 3, at 4 & Attachment.

The antidumping statute mandates that the Department rely on facts otherwise available where, inter alia, a party fails to provide the agency with requested information in the time, manner, or form specified.  19 U.S.C. § 1677e(a)(2)(B).  "The statutory directive that Commerce use [facts available] is intended to serve 'the basic purpose of the statute – determining current margins as accurately as possible.'"  D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed. Cir. 1997) (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191, reh'g en banc denied, 1990 U.S. App. LEXIS 7144 (Fed. Cir. 1990)). Consistent with the antidumping statute's broader goal of accuracy in margin calculation, the Department's selection of facts available must also "induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner . . . ."  Nat'l Steel Corp. v. United States, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994) (citation omitted).  In seeking the appropriate facts upon which the agency intends to

rely, Commerce enjoys broad discretion, see Mannesmannrohren-Werke AG v. United States, 120 F. Supp.2d 1075, 1088-89 (Ct. Int'l Trade 2000) ["Mannesmann II"], which "is subject to a rational relationship between data chosen and the matter to which they are to apply."  Manifattura Emmepi S.p.A. v. United States, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992).

Although the Department was permitted to conclude, on the basis of record evidence, that insufficient reliable data existed to calculate a duty drawback adjustment, the agency's solution failed to address the concerns raised by the possibly inaccurate record data.  First, as acknowledged by Commerce, the average that became the modified drawback adjustment "did not specifically take into account whether the bank fees were included in the guarantee-based drawback adjustment claims made by Saha Thai."  Def.'s Supp. Br. at 16.  Second, it is unclear why the Department selected a simple average of the relevant shipments rather than a weighted average, which undoubtedly would have provided a more accurate representation of the drawback amounts per ton.  Commerce is correct that its selection of facts available is not required to be the "best alternative information."  SAA, at 869, reprinted in 1994 U.S.C.C.A.N. at 4198.  Nevertheless, the agency must provide a reasoned explanation why it chooses a simple calculation methodology that

on its face appears less probative than an alternative, equally-simple methodology.[10]  Cf. Nat'l Steel, 870 F. Supp. at 1136 ("Commerce's actions may become unreasonable in nature if 'the agency . . . [has] . . . reject[ed] low margin information in favor of high margin information that was demonstrably less probative of current conditions.'" (quoting Rhone Poulenc, 899 F.2d at 1190)).  Notwithstanding the court's request for supplemental briefing, the Department has also failed to explain how its use of facts available mitigates the two possible problems raised by reliance on Saha Thai's information:  (1) excessive drawback adjustment because the claimed drawback amounts may have improperly included the bank guarantee fees, and

---

[10]    In this regard, the facts of this case stand in contrast to those present in Mannesmann II, where the court upheld the agency's facts available methodology.  The Department in the underlying proceeding at issue in Mannesmann II applied facts available to calculate a more accurate figure for U.S. duties paid by respondent when respondent was shown to have underreported the requested data.  See 120 F. Supp.2d at 1080-81. For shipments that had been verified, Commerce took a simple average of the differences between the respondent's (under)reported U.S. duties paid and what was found to have been the actual U.S. duties paid.  See id. at 1088.  That average was added to U.S. duties reported by respondent for sales not verified by the Department.  See id. at 1081.  Unlike the case here, however, the Department in Mannesmann II consciously decided not to use a weighted average and provided an explanation for its refusal to do so, and there does not seem to have been an issue as to the incentive prong of the facts available purpose. See id. at 1088 (citing Remand Determination at 18).  See infra discussion in text.

(2) drawback adjustment exceeding the actual amounts rebated (or exempted from import duties).  In the absence of such an explanation, the Department has failed to establish a "rational relationship" between the adjustment data it calculated and the accurate duty drawback amounts that should be added to Saha Thai's export price.  Manifattura Emmepi, 16 CIT at 624, 799 F. Supp. at 115.  Finally, without rationally explaining how its selection of facts available will result in a more accurate duty drawback adjustment, the Department cannot fulfill its responsibility under the second prong of its duty drawback test to limit rebate adjustments to the actual amount of charges rebated (or exempted from import duties).  See Far East Mach. Co. v. United States, 12 CIT 972, 974-75, 699 F. Supp. 309, 312 (1988); Carlisle Tire & Rubber Co. v. United States, 11 CIT 168, 172, 657 F. Supp. 1287, 1290 (1987).

The error in Commerce's selection of facts available is also evidenced by the more favorable outcome granted to Saha Thai as a result of the Department's facts available analysis than Saha Thai would have gotten had the Department accepted the company's proffered drawback amounts.  According to the Department's own calculations, the agency's facts available methodology "increased the total amount of duty drawback claimed by Saha Thai by [ ]%."  Def.'s Supp. Br. at 18.  Such a beneficial outcome for a

respondent, in light of its failure to provide sufficiently complete and reliable data upon the agency's request, controverts the incentives that are intended to be generated by the Department's reliance on facts available.  See Gourmet Equip. (Taiwan) Corp. v. United States, No. 99-05-00262, 2000 WL 977369, at *2 (Ct. Int'l Trade 2000) ("The use of facts available provides the 'only incentive to foreign exporters and producers to respond to Commerce questionnaires' in antidumping and countervailing duty proceedings."  (quoting SAA, at 868, reprinted in 1994 U.S.C.C.A.N. at 4198)).  The Department's facts available analysis, therefore, is unsupported by substantial evidence on the record.


## Conclusion

Because plaintiff failed to cite to sufficient evidence to overcome the regulatory presumption favoring invoice date as the date of sale, the Department's date of sale determination is upheld.  Commerce also properly recognized Saha Thai's entitlement to a duty drawback adjustment, but the Department's selection of facts available in calculating the amount of respondent's duty drawback adjustment is not supported by substantial record evidence.  This matter is therefore remanded to Commerce to explain (1) why the Department's simple average

calculation should be used instead of a weighted average calculation, (2) how the simple average calculation adequately addresses the accuracy concerns raised by the data submitted by Saha Thai, and (3) how the simple average calculation serves the dual objectives of the facts available provision to promote accuracy in margin calculation and to provide respondents with incentive to report information completely, accurately, and in a timely manner.  Alternatively, the Department may calculate on remand a new duty drawback adjustment using facts available, provided that its methodology also responds to the concerns raised by respondent's submitted data and is consistent with the objectives of the facts available provision.

_____
                              Jane A. Restani
                                 Judge

DATED:  New York, New York
        This 18th day of January, 2001