AG DER DILLINGER HÜTTEN-WERKE, EKO Stahl GmbH, Salzgitter AG Stahl und Technologie, Stahl Werke Bremen GmbH, and Thyssen Krupp Stahl AG, Plaintiffs,

v.

THE UNITED STATES, Defendant,

v.

International Steel Group, Inc., and United States Steel LLC, Defendant–Intervenors.

SLIP OP. 04–9.
No. 00–09–00437.

United States Court of International Trade.

Jan. 29, 2004.

See also 193 F.Supp.2d 1339 and 2002 WL 31008985.

deKieffer & Horgan (Marc E. Montalbine, Merritt R. Blakeslee, and Wakako O. Takatori) for plaintiffs.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Ada E. Bosque), Augusto Guerra, Office for the Chief Counsel for Import Administration, United States Department of Commerce, for defendant, of counsel.

Stewart and Stewart, Washington, DC (Terence P. Stewart) for defendant-intervenor International Steel Group, Inc. Dewey Ballantine LLP (John A. Ragosta and John W. Bohn) for defendant-intervenor United States Steel LLC.

### OPINION

RESTANI, Chief Judge.

This matter comes before the court following its decision in *AG der Dillinger Hüttenwerke v. United States,* No. 00–09–00437, 2002 WL 31008985 (CIT Sept. 5, 2002) (*"Dillinger II"*), in which the court remanded the *Results of Redetermination Pursuant to Court Remand* (Dep't Commerce Apr. 30, 2002) on *Certain Corrosion–Resistant Carbon Steel Flat Products; Cold–Rolled Carbon Steel Flat Products; and Cut–to–Length Carbon Steel Plate Products from Germany,* 65 Fed.Reg. 47,407 (Dep't Commerce Aug. 2, 2000) (final determ. upon sunset review) to the United States Department of Commerce, International Trade Administration

("Commerce" or "the Department"). In *Dillinger II*, the court instructed Commerce to, *inter alia:* (1) calculate the net countervailable subsidy rates likely to prevail if the countervailing duty ("CVD") orders on corrosion-resistant flat products and cut-to-length carbon steel plate products ("CTL plate") were revoked, Slip Op. 02–107, at 13, 25; (2) make a "good cause" determination before relying upon the Domestic Producers' "vague, unsupported" allegations of new subsidy programs for the German steel industry,[1] *id.* at 14–15; and (3) reconsider its likelihood determination in light of significant changes in international law that may have affected certain subsidy programs, *id.* at 21–22, 25–26. The court now reviews the *Final Results of Redetermination Pursuant to Court Remand* (Dep't Commerce July 14, 2003) [hereinafter *Second Remand Determination*], in which the Department continued to find that the continuation or recurrence of countervailable subsidies is likely if the CVD order on corrosion-resistant steel were revoked, because substantial countervailable benefits will exist beyond the sunset review period. *Id.* at 7. With respect to the CVD order on CTL plate, however, the Department made a negative likelihood determination upon second remand, having found that all programs related to that order had either terminated or provided only de minimis benefits beyond the sunset review period. *Id.*

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000). The court will up-

hold Commerce's determinations in CVD investigations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000).

## BACKGROUND

The factual and procedural history of Commerce's initial Sunset Determination and the first Remand Determination are fully explained in the court's two prior opinions in this matter. *See Dillinger II*, 2002 WL 31008985; *AG der Dillinger Hüttenwerke v. United States*, 193 F.Supp.2d 1339, 1342–45 (CIT 2002) (*"Dillinger I"*). Upon the court's second remand, Commerce conducted broad additional fact-finding by sending a questionnaire to the German Producers of subject merchandise, the Government of Germany ("GOG"), and the European Commission ("EC") requesting further information on four subsidy programs: Aid for Closure of Steel Operations, ECSC Redeployment Aid under Article 56(2)(b), Joint Scheme, and Upswing East. *Second Remand Determ.* at 8. Specifically, Commerce requested information on the German Producers' total sales and benefits received in the year 2000 and the termination of each program. *Id.* Pursuant to the court's instructions, the German Producers were also given the opportunity to submit argument and evidence regarding changes in law that may have had an impact on the status of these programs. *Id.* Commerce then sent verification outlines to the GOG and three of the German Producers of subject merchandise,[2] and a

1. By order filed on December 6, 2002, the court instructed Commerce "to evaluate the [Domestic Producers'] new subsidy allegations made in the original sunset review according to the statutory standard, but only if it failed to evaluate such claims properly in its original sunset determination." The court

noted that the Department could not use the court's second remand to extend the time for the Domestic Producers to submit new subsidy allegations.

2. Verification outlines were sent to Thyssen Krupp Stahl AG, Salzgitter AG Stahl und Technologie, and EKO Stahl GmbH. *Second*

team traveled to Germany to conduct a verification of information submitted. *Id.*

Commerce issued its *Second Remand Determination* on July 14, 2003. As it did in its first remand, Commerce used an eleven-year Average Useful Life ("AUL") to determine the rate of subsidization, if any, that would exist in the year 2000. *Id.* After analyzing the additional information gathered upon second remand, Commerce concluded that no benefits above de minimis extend beyond the sunset review period for the Aid for Closure of Steel Operations, ECSC Redeployment Aid under Article 56(2)(b), and Upswing East subsidy programs. *Id.* at 8–10, 12. With respect to the Domestic Producers' new subsidy allegations, Commerce determined that there was sufficient "good cause" to evaluate them, but nevertheless concluded that the evidence submitted by petitioners in the original sunset review did not merit the initiation of an investigation into those programs. *Id.* at 12–13. Accordingly, Commerce determined that revocation of the CVD order on CTL plate would not likely lead to the continuation or recurrence of subsidization and that the order should be revoked.[3] *See Second Remand Determ.* at 7, 17.

Commerce continued to find, however, that the revocation of the CVD order on corrosion-resistant steel products would be likely to lead to the continuation or recurrence of countervailable subsidies. *Id.* at 1. Specifically, the Department found that the Joint Scheme economic assistance program is not terminated and is not likely to be terminated, and that the federal portion of its funding is "specific" to the steel industry and is therefore countervailable.[4] *Id.* at 10–11. Despite a finding that government aid to the German steel industry is prohibited under a number of European Community decisions and directives, Commerce determined that subsidies under the Joint Scheme program were provided prior to the change in European law effective in 1997, "and thus the companies participating in this program continue to receive benefits . . . from grants received before 1997. The EC decision did not negate the receipt of subsidies previously received or require repayment." *Id.*

Responding to the German Producers' argument that these subsidies were non-actionable "green light" subsidies,[5] Commerce found that, "assuming *arguendo* that we would have treated these subsidies as non-countervailable under 19 U.S.C. § 1677(5B)(C), which we do not concede here, the statute provides that their non-countervailable status would have expired by June 1, 2000, which is prior to the end

---

*Remand Determ.* at 8. Commerce chose not to verify the information submitted by Stahlwerke Bremen GmbH and AG der Dillinger Hüttenwerke, because Dillinger had not received benefits under any of the programs and Bremen, which had only participated in the ECSC program, provided sufficient information to calculate its subsidy rate for the year 2000. Commerce corroborated these facts at the verification of the GOG. *Id.* n. 9.

**3.** No party challenges this determination here.

**4.** The Joint Scheme program is financed equally by the federal and state governments of Germany. *Second Remand Determ.* at 11.

Record evidence established that the state governments provided funding under the Joint Scheme program to a "substantial number" of various industries ranging from textiles to chemicals to steel. *Id.* (citing GOG Verification Report at Exs. 6–7). The state portion of aid is thus not specific to the steel industry and is not countervailable. *Id.*

**5.** Generally speaking, "green light" subsidies are nonspecific subsidies provided to companies in economically-disadvantaged regions pursuant to a general regional development plan. Such subsidies are not countervailable if certain conditions are met. *See* 19 U.S.C. § 1677(5B)(C) (2000).

of the sunset reviews." *Id.* at 11 (citing 19 U.S.C. § 1677(5B)(G)(i)). Based on information submitted by the German Producers and verified by Commerce, the Department found that two companies, EKO and Salzgitter, received grants under the Joint Scheme program, but Commerce determined that only EKO would receive benefits above de minimis beyond the sunset review period. *Id.* Accordingly, Commerce found that, in terms of the corrosion-resistant steel products order, there is a likelihood that the Joint Scheme program would provide above de minimis subsidies beyond the sunset review period. *Id.*

The *Second Remand Determination* next addressed the countervailability of the privatization subsidies provided to EKO in 1994.[6] Commerce recognized that, in light of recent circuit precedent, it must examine the particular facts and circumstances of the sale and determine whether EKO directly or indirectly received both a financial contribution and a benefit from the German government. *Id.* at 14 (discussing *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed.Cir.2000) ("*Delverde III*")). To implement *Delverde III*, Commerce developed what it calls the "same person" privatization methodology, which it has applied on several occasions. *Id.*

Under this methodology, Commerce first determines whether the legal person (or entity) to which the subsidies were given was, in fact, distinct from the legal person that produced the subject merchandise exported to the United States. *Id.* at 15. In order to make this determination, Commerce considers factors such as whether there was: (1) continuity of general business operations, including whether the successor holds itself out as the continuation of the previous enterprise; (2) continuity of production facilities; (3) continuity of assets and liabilities; and (4) retention of personnel. *Id.* "[T]he Department will generally consider the post-sale person to be the same person as the pre-sale person if, based on the totality of the factors considered, we determine the entity in question can be considered a continuous business entity because it was operated in substantially the same manner before and after the change in ownership." *Id.* If the Department concludes that the original subsidy recipient and the current producer/exporter are the same legal person, then Commerce will presumptively find that both a "financial contribution" and a "benefit" have been received by the "person" under investigation, rendering that entity liable for the countervailing duties imposed to offset the subsidies. *See id.* But if, however, the

6. EKO was owned by the Treuhandanstalt at the time of German reunification in 1990. *Second Remand Determ.* at 13. The Treuhandanstalt was created by the German Democratic Republic ("GDR") in 1990 to serve as the owner and administrator of all non-private GDR enterprises. *Steel Wire Rod from Germany*, 62 Fed.Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997) (final). The Treuhandanstalt's long-term goal was to privatize these enterprises by providing them with a variety of economic assistance measures, such as loan guarantees backed by the Federal Republic of Germany ("FRG"). *See id.*

In order to facilitate the sale of EKO, the European Union approved a variety of assistance measures in 1994, after a third attempt to sell the company failed. *Second Remand Determ.* at 13. Assistance measures included 896.6 million DM in compensation for pre-privatization and future losses, investment aid, and financing for the cost of repairs. In addition, EKO received a Treuhandanstalt guarantee covering a DM 60 million investment loan, representing an aid element of DM 4.02 million, in addition to DM 385 million under the Joint Scheme regional investment aid subsidy programs. *Id.* at 13–14 (citing EKO Verification Report Ex. 6 at 8/40, 9/40).

Department determines that the two entities are distinct, then it will analyze whether a subsidy has been provided to the purchasing entity as a result of the change-in-ownership transaction. *Id.*

Applying these principles to EKO, Commerce concluded that the privatized EKO is the same legal person as the subsidized EKO and, as a result, any subsidies received by EKO prior to its privatization in 1995 continued to benefit the company after its privatization. *Id.* at 16. With respect to continuity of general business operations, Commerce verified that, upon privatization, EKO maintained its same name, products, and business strategy (i.e., focusing on markets in Germany and Eastern Europe) as the pre-privatization EKO. Thus, Commerce determined that EKO's business operation did not change as a result of the privatization. *Id.* at 15. As to the second factor, continuity of production facilities, record evidence established that "most" of EKO's production facilities existed pre-privatization, with the exception of the addition of a modern hot-rolling facility.[7] *Id.* Commerce also found that there was continuity of assets and liabilities pre- and post-privatization, because information reviewed at verification revealed that there were no significant changes in either the company's physical assets or its liabilities as a result of the privatization.[8] *Id.* at 16. Finally, EKO officials indicated that, notwithstanding the retirement of some employees, EKO's personnel had not significantly changed since 1994. Accordingly, Commerce found continuity in personnel. *Id.* Having found that present-day EKO is the same legal "person" as the subsidized EKO, Commerce allocated the pre-privatization subsidy benefits over an eleven-year AUL and found a subsidy rate for these programs "significantly above de minimis for the year 2000 and beyond." *Id.*

Commerce then addressed the likelihood of continuation or recurrence of a countervailable subsidy should the CVD orders be revoked. Because the record evidence indicated that EKO would receive benefits above de minimis beyond the sunset review period from both the Joint Scheme and the privatization subsidy programs, the Department found that, in terms of the corrosion-resistant steel products order, there is a likelihood that revocation of the order would be likely to lead to the continuation or recurrence of countervailable subsidies. *Id.* at 16–18. As noted above, however, all subsidy programs tied to the production of CTL plate either expired before the sunset review period or ceased to provide above de minimis benefits, and thus Commerce made a negative likelihood determination on the CVD order on CTL plate. *Id.* at 17.

Finally, Commerce determined the net countervailable subsidy rates likely to prevail should the CVD orders be revoked. Consistent with its current practice, the Department calculated company-specific rates by summing the various programs' subsidization rates as calculated for each

---

7. "The information on the record indicates that EKO's facilities include two blast furnaces, a sinter plant, a continuous casting plant, a hot-rolling mill, a cold-rolling mill, an annealing plant, a hot-dip galvanizing facility, an organic acid casting facility, and a slitting/cutting line.... [M]ost of these facilities were in place prior to the privatization." *Second Remand Determ.* at 15 (citing EKO Verification Report Ex. 6 at 2, 6).

8. Commerce summarily explains that, "[b]ecause Commerce did not request information in its questionnaire regarding EKO's privatization, the information on the record is limited to the information reviewed by Commerce at verification." *Id.* at 16 (citing EKO Verification Report Ex. 6).

company. *Id.* Of the corrosion-resistant steel producers, only EKO had an above de minimis subsidy rate: 7.57 percent. *Id.* at 18. The subsidy rates likely to prevail on the CTL plate products were all de minimis. Accordingly, as it had in its prior determinations, Commerce continued to find that revocation of the CVD order on corrosion-resistant steel would be likely to lead to the continuation or recurrence of countervailable subsidies. *Id.* Because Commerce rendered a negative likelihood determination on the CTL plate order, however, the Department determined to revoke that order. *Id.*

Plaintiffs, German Producers of corrosion-resistant and cut-to-length carbon steel flat products, agree with Commerce's determination to revoke the CVD order on CTL plate.[9] Plaintiffs do, however, contest the Department's likelihood determination on the corrosion-resistant steel products order. They argue that EKO was privatized through a fair market value, public sale and that the privatization and regional assistance subsidies received by EKO qualify for noncountervailable "green light" treatment pursuant to 19 U.S.C. § 1677(5B)(C). According to Plaintiffs,

because neither of these transactions provided a countervailable benefit, they cannot support Commerce's decision to continue the CVD order on corrosion-resistant flat products.

## DISCUSSION

The German Producers raise a number of arguments against the continuation of the CVD order on corrosion-resistant steel products.[10] Plaintiffs challenge the Department's decisions on the countervailability of EKO's privatization subsidies and the benefits the company received under the Joint Scheme program, asserting that those determinations are not supported by substantial evidence and are not in accordance with law. Accordingly, the German Producers ask the court to vacate Commerce's *Second Remand Determination* with respect to corrosion-resistant flat products and enter a final judgment directing Commerce to revoke the CVD order pursuant to 19 U.S.C. § 1675(d)(2).

### A. Privatization of EKO Stahl

The German Producers raise four main arguments against the countervailability of EKO's privatization subsidies.[11] Plaintiffs

9. Defendant–Intervenors, producers of the domestic like products, have not filed comments or objections to the *Second Remand Determination.*

10. As an initial matter, Plaintiffs argue that EKO, which is located in the former East Germany on the border of Poland, is not relevant to these proceedings because the company was not a party to the original CVD investigation and has never exported significant amounts of subject merchandise to the United States. The court disagrees. Although EKO was not involved in the original investigation on corrosion-resistant steel, EKO participated in the sunset review and the present remand. As a party to the second remand, EKO responded to a questionnaire and participated in on-site verification in Germany.

The court finds that the information provided by EKO and verified by Commerce was relevant to the Department's likelihood determination and in accordance with law. By contrast, whether or not EKO has made any "significant" exports to the United States is not a determining factor upon sunset review. *See* 19 U.S.C. §§ 1675(c)(1) & (d)(2)(A), 1675a(b) (2000) (indicating that the purpose of a five-year sunset review is to determine whether revocation of the countervailing duty order would be likely to lead to continuation or recurrence of a countervailable subsidy).

11. The German Producers first complain that EKO had no prior notice that Commerce was interested in reviewing its privatization transaction, because the Department had on several occasions refused to investigate the Domestic Producers' new subsidy allegations and failed to request any information about the

first argue that the benefits provided by the Treuhandanstalt, the sole shareholder of EKO stock prior to German reunification, was "simply a fulfillment of the obligations that it had already taken on prior to reunification" and, accordingly, should be viewed as noncountervailable transnational assistance under *Steel Wire Rod from Germany*, 62 Fed.Reg. 54,990, 54,-994–95 (Dep't Commerce 1997) (final) (finding that the secondary backing by the FRG of Treuhandanstalt loan guarantees on borrowings of East German companies *prior to unification* is noncountervailable transnational assistance). Second, the German Producers argue that the assistance provided by the Treuhandanstalt is noncountervailable because its activities to transition East Germany from a centrally-planned economy to a market economy qualifies as non-specific disaster relief under 19 C.F.R. § 351.502(f). Third, Plaintiffs argue that the privatization benefits were part of an arms' length, fair market value transaction that extinguished any countervailable benefits under the Federal Circuit's *Delverde III* decision and a WTO Appellate Body Report invalidating the same person methodology,[12] especially in light of certain conditions imposed upon EKO's new owner by the EC to minimize market distortions from the sale and prevent economic advantages inconsistent with market considerations.[13] Thus, Plaintiffs claim that Commerce erred in ignoring the economic information concerning the sale and "simply applying its discred-

privatization in its second remand questionnaire or its verification outline. Thus, Plaintiffs argue that Commerce "could not surprise EKO Stahl at verification by raising the privatization for the first time" and "cannot draw negative inferences from EKO Stahl's information or claim that necessary information is not on the record." Plaintiffs' Objections to July 14, 2003 Remand Determination ("Pls.' Objections") at 8.

Plaintiffs raised this exact argument before the agency, but Commerce explained that "[i]t was only during the course of examining EKO's company history and verifying the company's legers and accounts, that Commerce discovered aid received by EKO during its privatization." *Second Remand Determ.* at 21–22 cmt. 4. Although the Domestic Producers might not have submitted enough information initially to warrant the initiation of an investigation into the alleged subsidies, Commerce cannot ignore new information revealed at verification. To do so would be in direct contravention of Commerce's statutory mandate in conducting sunset reviews, i.e., to determine the net countervailable subsidy rate likely to prevail should the CVD order on corrosion-resistant steel be revoked. *See* 19 U.S.C. § 1675a(b); *Dillinger I*, 193 F.Supp.2d at 1355. Thus, Commerce's decision to investigate EKO's privatization subsidies at verification is in accordance with law.

**12.** The German Producers cite the WTO Appellate Body Report on Countervailing Measures Concerning Certain Products from the European Communities, WT/DS212/AB/R, at para. 126 & 151 (Dec. 9, 2002) (finding that privatization at arm's length and for fair market value gives rise to a rebuttable presumption that the countervailable benefit ceases to exist, and rejecting the same person methodology as inconsistent with the United States' international obligations under the Agreement on Subsidies and Countervailing Measures). The court does not rely on the Appellate Body Report. *Delverde III* mentions a WTO panel decision on British steel that similarly invalidated Commerce's old "pass through" methodology, but expressly relies on the statute. 202 F.3d at 1369 ("Because we hold Commerce's methodology to be invalid under the amended Tariff Act irrespective of the WTO's decision, we do not consider the relevance of that decision except to note that it is not inconsistent with our holding"); *see infra* Part A.3.

**13.** Plaintiffs noted that "[t]hese conditions included the purchase and shutdown of HES Henningsdorfer Elektrostahlwerke GmbH, 10–year capacity limitations on the then-planned new hot-wide-strip mill, and the limitation that the output from the new strip mill could only be used in the company's cold-rolling facilities." Pls.' Objections at 10 (citing EKO Stahl Verification Ex. 6 at 6–14).

ited same-person methodology," especially since, on March 21, 2003–almost four months before the *Second Remand Determination* issued–Commerce announced a new privatization methodology in which it would consider whether a privatization "was at arm's length [and] for fair market value" in determining the countervailability of the transaction. Pls.' Objections at 10 (quoting *Notice of Proposed Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act and Request for Public Comment*, 68 Fed. Reg. 13,897, 13,900 (Dep't Commerce Mar. 21, 2003)). Finally, Plaintiffs claim that, even if the Department's same person methodology is in accordance with law, there is insufficient evidence to support the Department's finding that EKO's subsidies are countervailable under that method.

### 1. *Steel Wire Rod* is Inapplicable

■ The German Producers maintain that EKO's privatization subsidies should be deemed noncountervailable transnational assistance under *Steel Wire Rod from Germany*. In that determination, the German producers of subject merchandise took out three loans guaranteed by the Treuhandanstalt, for which the Federal Republic of Germany issued secondary guarantees, prior to German reunification and one shortly after unification. 62 Fed. Reg. at 54,994; *see supra* n. 6 (explaining the Treuhandanstalt's role in privatizing companies from former East Germany). Approximately one year after unification, the Treuhandanstalt assumed the guaranteed loans. *Steel Wire Rod*, 62 Fed.Reg. at 54,994.

In analyzing the countervailability of those assistance measures, Commerce explained that its analysis focuses on the nature of the benefit as transnational or not at the time it was bestowed. *Steel Wire Rod*, 62 Fed.Reg. at 55,002. In *Steel Wire Rod*, because the GDR was a sovereign country separate from the FRG prior to reunification, any assistance by the FRG to former GDR enterprises was considered noncountervailable transnational assistance. *Id.* Accordingly, Commerce found that the secondary backing by the FRG of Treuhandanstalt loan guarantees on borrowings *prior to reunification* was noncountervailable transnational assistance. *Id.* at 94,994–95. Commerce also determined that the Treuhandanstalt's subsequent debt assumption did not give rise to a countervailable benefit because the Treuhandanstalt was "merely fulfilling" its pre-unification obligations as guarantor. *Id.* at 94,995. With respect to the one loan guaranteed by the Treuhandanstalt after unification, Commerce specifically declined to analyze whether it gave rise to a countervailable subsidy, because there was no benefit allocable to the POI. *Id.*

The facts in the present case are much different. Here, the various assistance measures provided to EKO by the Treuhandanstalt to facilitate its privatization took place in 1994, approximately four years after Germany reunified. *See supra* n. 6. Thus, the countervailability of EKO's privatization subsidies is not governed by *Steel Wire Rod*, where the loan guarantees were provided by the FRG to a GDR company prior to reunification. Plaintiffs' argument that the Treuhandanstalt's assistance in 1994 "stemmed from its legal obligations as sole shareholder of the company, an event that took place before reunification" is similarly unpersuasive. *See* Pls.' Objections at 5–6. Plaintiffs cite no authority for the proposition that shareholders of corporations are legally obligated to guarantee the corporation's debt or provide other forms of financial assistance, such as the investment aid and grants provided to EKO by the Treuhandanstalt

in 1994 to facilitate its sale. There is no such obligation, unlike the obligation of a loan guarantor to assume the debt should the company default. Accordingly, *Steel Wire Rod* is inapplicable, and Commerce's determination that EKO's privatization subsidies could not be considered transnational assistance is supported by substantial evidence and is otherwise in accordance with law.

### 2. EKO's Privatization Subsidies Are Specific

■ The German Producers argue that the activities of the Treuhandanstalt failed to meet the statutory definition of a "countervailable subsidy" because they were not specific to the steel industry and therefore qualify as non-specific disaster relief under federal regulations. The regulation provides that Commerce "will not regard disaster relief as being specific … if such relief constitutes general assistance available to anyone in the area affected by the disaster." 19 C.F.R. § 351.502(f). Without citation to controlling authority, Plaintiffs argue that the sudden collapse of the East German economic and political system qualifies as a "disaster" under the regulation. But, as Commerce explained in response to comments to the *Second Remand Determination*, this provision was intended to address aid stemming from natural disasters such as floods, not the privatization of centrally controlled economies. *Second Remand Determ.* at 20 cmt. 1. Even if the economic restructuring could be considered disaster relief, the regulation requires that the relief be generally available to all sectors, which is not the case here. The record in this case establishes that the privatization aid received by EKO was provided through a program specific to EKO to facilitate its sale after three attempts to do so had failed. *See supra* n. 6. In fact, "[t]he EC decision that provides this aid specifically names EKO as the beneficiary of this assistance." *Second Remand Determ.* at 19. Thus, the record does not support the German producers' contention that the privatization subsidies provided to EKO were non-specific and therefore noncountervailable.

### 3. The Privatization Methodology Employed By Commerce Was Not In Accordance With Law

■ While it is true that Commerce has developed a new privatization methodology that evaluates whether a company was privatized through an arm's length transaction at fair market price, this methodology only applies in investigations and reviews initiated on or after June 30, 2003. *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed.Reg. 37,125, 37,138 (Dep't Commerce June 23, 2003). Because the new methodology was not directly applicable to the present sunset review, the issue here is whether the "same person" methodology Commerce did employ comports with the standards announced by the Federal Circuit in *Delverde III*. *See* Background section, *supra* (explaining new methodology).

In *Delverde III*, the court struck down Commerce's former "pass through" change-in-ownership methodology, which assumed that when an entity sells productive assets during their AUL, a pro rata portion of the subsidy passes through to the purchaser at the time of the sale. 202 F.3d at 1364. The court explained that Commerce cannot conclusively presume that a privatized company received a government subsidy simply as a result of an asset purchase. *Id.* at 1367. "Rather, the Tariff Act requires that Commerce make such a determination by examining the particular facts and circumstances of the sale and determining whether Delverde

directly or indirectly received both a financial contribution and benefit from a government" before countervailing duties can be assessed after a change in ownership. *Id.* at 1364. Because the court found the statute clear on this point, it refused to accord *Chevron* deference to the Department's choice of methodology. *Id.* at 1367. The court found that, because Commerce failed to fully examine the facts of the sale and "make the specific findings of financial contribution and a benefit to Delverde that are required by §§ 1677(5)(D) and (E)," its determination was not in accordance with law. *Id.* The court noted that had the Department fully examined the facts, it might have found that the purchaser paid full value for the assets without benefitting from the prior owner's subsidies. *Id.* at 1368.

As explained above, Commerce developed its same person methodology in response to *Delverde III*, but it has received somewhat mixed treatment by this court and is currently the subject of several appeals to the Court of Appeals for the Federal Circuit ("CAFC"). *Compare Acciai Speciali Terni S.p.A. v. United States*, 206 F.Supp.2d 1344 (CIT 2002) (Carman, C.J.) (upholding same person methodology as consistent with the statute and *Delverde III* ), *reh'g denied*, 217 F.Supp.2d 1345 (CIT 2002), *appeal dismissed per stipulation*, 76 Fed.Appx. 948 (Fed.Cir.2003), *with Allegheny Ludlum Corp. v. United States*, 182 F.Supp.2d 1357 (CIT 2002) (Barzilay, J.) (rejecting same person methodology because it does not comport with *Delverde III's* requirement that Commerce examine the facts and circumstances surrounding the transaction to determine if a financial contribution and

benefit passed through to the purchaser of the privatized corporation), *appeal docketed*, Nos. 03–1189 (Fed.Cir. Jan. 3, 2003) and 03–1248 (Fed.Cir. Feb. 11, 2003); *GTS Indus. S.A. v. United States*, 182 F.Supp.2d 1369 (CIT 2002) (Barzilay, J.) (same), *appeal dismissed per stipulation*, 90 Fed.Appx. 404 (Fed.Cir.2004); *Acciai Speciali Terni S.p.A. v. United States*, No. 99–06–00364, 2002 WL 342659 (CIT Feb. 1, 2002) (Wallach, J.) (same); *and Ilva Lamiere E Tubi S.R.L. v. United States*, 196 F.Supp.2d 1347 (CIT 2002) (Goldberg, J.) (same).

The court agrees with the majority of its judges who have addressed the issue that the same person methodology is not in accordance with law as expressed in *Delverde III*. That case interpreted the Tariff Act to require Commerce to examine the privatization transaction in detail and to make specific findings that the purchasers received both a financial contribution and a benefit from a government. Commerce's attempt to satisfy this holding with the same person test cannot stand. Had Commerce evaluated the particular facts and circumstances of EKO's privatization transaction, it might have found that the newly privatized company gained no countervailable benefit from the nonrecurring subsidies at issue here.[14] Plaintiffs cite record evidence that (1) EKO was privatized through an open bidding process that included three separate stages and involved ten different companies and international consortia; (2) the bid of Cockerill Sambre was eventually selected as the best bid, and that the entire transaction was reviewed and approved by the EC; and (3) the EC placed several conditions upon the new owners to prevent market

---

14. The court is sympathetic to Commerce's dilemma. It is unclear exactly how one can determine if benefits continue after a bid sale. There is obviously some opportunity to circumvent countervailing duty remedies. Nonetheless, Commerce must devise a methodology that meets the *Delverde III* directive.

distortion and unfair economic advantage as a result of the transaction. Pls.' Objections at 10 (citing EKO Stahl Verification Ex. 6 at 2–3, 6–14). Because Commerce failed to follow *Delverde III's* requirements to scrutinize the transaction and make specific findings supporting the continued countervailability of benefits given to the subsidized EKO, its *Second Remand Determination* on this issue is not in accordance with law.

## B. Countervailability of the Joint Scheme Aid

■ The German Producers also challenge Commerce's determination to treat the federal portion of the Joint Scheme aid received by EKO as countervailable, arguing that the program qualifies for green light status under 19 U.S.C. § 1677(5B). Plaintiffs concede that the green light provision expired on June 1, 2000, prior to the end of the sunset review, but they continue to argue that the Joint Scheme subsidies are noncountervailable because they were *provided* while the green light provision was in force. Plaintiffs also argue that there is no countervailable benefit under this nonrecurring subsidy program due to the EC decisions prohibiting aid to the steel industry after January 1, 1997.

The court finds that the Department's analysis on the countervailability of the Joint Scheme aid is supported by substantial evidence and is otherwise in accordance with law. With respect to the German Producers' green light argument, the statute explicitly provides that the green light provisions "shall not apply on or after" June 1, 2000. 19 U.S.C. § 1677(5B)(G)(i). Thus, the Department reasonably considered the Joint Scheme aid as countervailable because its green light status, if any, expired on June 1,

2000. Because the statute specifically provides that the green light provisions shall not apply on or after June 1, 2000, Commerce's determination is in accordance with law. As for the affect of changes of international law on this program, the Department found that the EC decisions prospectively prohibiting aid to the steel industry as of January 1, 1997 do not affect benefits provided before that date. *Second Remand Determ.* at 10–11. Applying the eleven-year AUL, Commerce determined that EKO would receive benefits above de minimis beyond the sunset review period. *Id.* at 11. This determination is supported by substantial evidence, and the German Producers have failed to prove otherwise. Accordingly, the court rejects Plaintiffs' challenges to the Department's findings on the countervailability of the Joint Scheme aid.

## CONCLUSION

Commerce's *Second Remand Determination* with respect to the countervailing duty order on cut-to-length plate is hereby sustained. As there is no reason to delay with respect to the order on this separate product, final judgment will be entered pursuant to Rule 54(b) of this court as requested by the German Producers. The Department's determination on the corrosion-resistant steel order, however, is remanded. On remand, Commerce shall "examin[e] the particular facts and circumstances of the sale" and determine whether Cockerill Sambre, the purchaser of EKO, directly or indirectly received both a financial contribution and benefit from the German government. *Delverde III*, 202 F.3d at 1364. Commerce shall file its redetermination within 45 days of the entry of this opinion,[15] and the parties shall have fourteen (14) days to file their objections.

---

**15.** As the one issue remanded is on appeal in other matters, the court will entertain a motion for a stay of the remand order pending resolution of this issue in the CAFC.

Commerce may file its reply within eleven (11) days thereafter.

SO ORDERED.