Slip Op. 09-27

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NAKORNTHAI STRIP MILL PUBLIC COMPANY LIMITED,<br><br>         Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>         Defendant,<br><br>      -and-<br><br>UNITED STATES STEEL CORPORATION,<br><br>         Defendant-<br>         Intervenor. | Before: Pogue, Judge<br><br>Court No. 07-00180<br><br>**PUBLIC VERSION** |

**OPINION**

[Commerce's second remand determination sustained.]

Dated: April 7, 2009

Hughes, Hubbard & Reed LLP (Kenneth J. Pierce, Robert L. LaFrankie, Victor S. Mroczka) for the Plaintiff.

Michael F. Hertz, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jane C. Dempsey); Matthew D. Walden, Attorney, Of Counsel, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for the Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Jeffrey D. Gerrish, Luke A. Meisner) for the Defendant-Intervenor.

**Pogue, Judge**: Plaintiff Nakornthai Strip Mill Public Co., Ltd.

("Nakornthai"),[1] Defendant United States (the "government") and Defendant-Intervenor U.S. Steel Corp. ("U.S. Steel") are before the court a third time following a second court-directed U.S. Department of Commerce ("Commerce") remand determination in this matter. See Final Results of Redetermination Pursuant to Second Remand, A-549-817, ADR 11/1/2004—10/31/2005 (Feb. 6, 2009) ("Second Remand Results"). In response to Commerce's Second Remand Results, Nakornthai again challenges Commerce's choice of the invoice date, rather than contract date, as the date of sale for the calculation of Nakornthai's antidumping duties.

Because Commerce's ultimate conclusion -- that Nakornthai has not established that the material terms of its contract were established on a date other than invoice date -- is based both on a reasonable legal interpretation of the applicable regulation and sufficient factual findings supported by substantial evidence, the court affirms Commerce's Second Remand Results.

## BACKGROUND

As a producer of hot-rolled carbon steel flat products ("hot-rolled steel") in Thailand, Nakornthai is subject to an antidumping order on its imports of hot-rolled steel into the United States. See Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 59,562 (Dep't Commerce Nov. 29, 2001) (notice of

---

[1] Nakornthai is now known as G J Steel Public Co. Ltd. For consistency, as the court has in its previous opinions, the court will continue to refer to the company under its former name.

antidumping duty order) ("Antidumping Duty Order").  From 2001 to 2007, as a result of the Antidumping Duty Order, Nakornthai paid the separate "all others" duty rate of 3.86 percent on its imports. See id. at 59,563.

In May 2007, following Commerce's publication of the opportunity to request an administrative review of the Antidumping Duty Order, see Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 70 Fed. Reg. 65,883 (Dep't Commerce Nov. 1, 2005) (notice of opportunity to request administrative review), U.S. Steel and Nucor Corp. ("Nucor") requested review for the period of November 1, 2004 through October 31, 2005.  Commerce granted this request, see Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 70 Fed. Reg. 76,024 (Dep't Commerce Dec. 22, 2005), and, after publishing preliminary results of its review, and inviting comments thereon by Nakornthai, U.S. Steel and Nucor, revised the Antidumping Duty Order to calculate a Nakornthai-specific dumping margin for the period of review (and a resulting antidumping duty cash deposit rate for the next review period) of 8.23 percent.[2]  See Certain Hot-Rolled Carbon Steel Flat Products

---

[2] More thorough descriptions of the facts can be found in this court's previous opinions in this matter. See Nakornthai Strip Mill Pub. Co. v. United States, 587 F. Supp. 2d 1303 (CIT 2008) ("Nakornthai II"); Nakornthai Strip Mill Pub. Co. v. United States, 558 F. Supp. 2d 1319 (CIT 2008) ("Nakornthai I"). Familiarity with these two opinions is presumed.

from Thailand, 72 Fed. Reg. 27,802, 27,803 (Dep't Commerce May 17,

2007) (final results and partial rescission of antidumping duty

administrative review) ("Final Results"); Issues & Decision

Memorandum, A-549-817, ADR 11/01/04-10/31/05 (May 7, 2007),

available at

http://ia.ita.doc.gov/frn/summary/THAILAND/E7-9526-1.pdf ("Decision

Memorandum"); Proprietary Arguments from the Issues and Decision

Memorandum for the Final Results of Certain Hot-Rolled Carbon Steel

Flat Products from Thailand, A-549-817, ADR 11/01/04-10/31/05 (May

7, 2007) ("Proprietary Memorandum").

During the period of review, according to Nakornthai's

responses to Commerce's questionnaires, Nakornthai made one U.S.

sale of hot-rolled steel pursuant to a contract with a U.S.

wholesaler (the "original contract").  The original contract

specified certain terms, including both a total "quantity

tolerance" and "per item tolerance level" of products to be

shipped.[3]  After the original contract was signed, Nakornthai and

its wholesaler executed three changes in the contract: elimination

---

[3] The contract provided for the sale of a specific quantity,
[    ] MT, of hot-rolled steel products at a uniform unit net
price of [        ]. ("MT" connotes metric tons.) The contract
further provided for both an overall "quantity tolerance" of +/-
a specific percentage [   ] for the total quantity, and a
specific individual line item tolerance, or "per item tolerance
level," of +/- a specific percentage [   ].  ("Quantity
tolerance" refers to acceptable range of quantities to be
purchased, expressed as a number, plus or minus (+/-) a specified
percentage.)  The individual line items referred to specific
products, identified by size, quality and thickness.

of the line item quantity tolerance level, changes to payment terms[4] and amendments to delivery dates.[5] Nonetheless, Nakornthai claimed, and continues to claim, that these changes are immaterial and did not affect the uniform net unit price or the total quantity agreed to be purchased.

At a certain point, Nakornthai issued commercial invoices to the wholesaler. The final invoice quantity, though changed slightly from the total quantity specified in the original contract, remained within the total quantity tolerance provided for in the original contract. In fact, the contract amendment affected less that 0.1% of the total quantity of goods sold and shipped under the contract, and each of the individual line item quantities shipped were also within the original stated tolerance levels, except for one single line item. The quantity shipped of the single, changed line item was 14.5% more than the upper end of the

---

[4] The original contract's payment terms were changed from total payment against a specified shipping receipt to payment of a specified percentage [                    ] against a different shipping receipt [                         ] and the remaining [  ] payment against another [     ] receipt. In addition, Nakornthai originally reported a particular date, [          ], as the payment date. However, the record shows that Nakornthai received payment on different dates, with [

                              ].

[5] The delivery date amendments involved changes to the letter of credit expiry date and last shipment date on the letter of credit. Nakornthai changed the expiration date from [      ] to [                ]. Nakornthai also changed the last shipment date from [                ] to [                ].

original line item tolerance level and more than 25% above the specific line item quantity for that product.

Faced with this record, Commerce made a "date of sale" determination pursuant to its regulations:

> In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i).[6]

Applying its regulation in Nakornthai's case, despite the limited nature of the quantity changes, Commerce concluded that the elimination of the line item tolerance levels demonstrated that the contract's material terms were not settled until the invoice date. According to Commerce, the elimination of the line item quantity tolerance level materially changed the original contract, because the elimination, at least potentially, allowed Nakornthai to make

_____

[6] Commerce has explained its use of the presumption in support of the use of invoice date: "in many industries, even though a buyer and seller may initially agree on terms of sale, those terms remain negotiable and are not finally established until the sale is invoiced." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19, 1997) (final rule). Thus, the party challenging this presumption bears the burden to prove that a different date "better reflects" the parties establishment of material contract terms and "must submit information that supports the use of [the] different date." Id.; see also Allied Tube & Conduit Corp. v. United States, 25 CIT 23, 25, 132 F. Supp. 2d 1087, 1090 (2001).

quantity changes affecting "product mix" and "resulting in [

] products being shipped." Proprietary Memorandum 14. Given this

finding, Commerce did not address the materiality of the changes to

payment and delivery terms, as it deemed these issues "moot." Id.

In response, and in accordance with 19 U.S.C §§

1516a(a)(2)(i)(I), 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c),

Nakornthai filed this action, to contest Commerce's determinations

in calculating Nakornthai's specific antidumping duty rate.

Specifically, as is relevant here, Nakornthai claimed that Commerce

erred by using the invoice date, instead of the contract date, as

the date of sale to determine its weighted average dumping margin

for the period covered by the administrative review and the

assessment rate going forward.[7] Nakornthai argued to Commerce and

argues before the court that Commerce should adhere to its "long-

standing practice" of using the contract date as the date of sale,

because, according to Nakornthai, the record reveals that the

contract date "better reflects the date on which the exporter or

producer establishe[d] the material terms of sale."

---

[7] Commerce's use of date of invoice instead of contract date affects the calculation of Nakornthai's dumping margin. See 19 C.F.R. § 351.401(a). As noted in Nakornthai I, "[t]he identification of a 'date of sale' for U.S. price may affect [Commerce's] comparison with sales in the foreign or 'home' market, for example, if exchange rates are changing during the period of review." Nakornthai I, 558 F. Supp. 2d at 1321 n.1.

### I. Nakornthai I

In Nakornthai I, the court affirmed Commerce's initial legal interpretation, holding that Commerce's identification of line item quantities as a "material term of sale" of Nakornthai's contract was based on the agency's reasonable interpretation of its own regulation. Nakornthai I, 558 F. Supp. 2d at 1327. In addition, the court refused to consider alternative dates of sale, other than contract date, as Nakornthai had failed to exhaust its administrative remedies on this issue. Id. at 1329-30.

However, the court held that Commerce's factual findings on the finality of the terms of sale were incomplete, and remanded the issue back to the agency for reconsideration. Id. at 1328-29. Noting that Commerce, in applying it's date-of-sale regulation, "weighs the evidence presented and regularly determines the significance of any changes to the terms of sales involved", id. at 1327, the court stated that "Commerce did not discuss or make a finding with regard to this [i.e., Nakornthai's] evidence [as to the quantities of goods actually ordered and delivered], either on its own or when considered in light of the elimination of the tolerance levels in the contract." Id. at 1328. Therefore, the court could not determine whether the variation in quantities for one line item was sufficiently significant, e.g., either to affect "product mix" in a significant way or to alter the dumping margin, to meet the regulatory standard that the terms of the contract not

be essentially "established." Id.  As such, the court remanded the case back to Commerce to make a factual finding "with regard to the significance of Nakornthai's evidence" and whether "the date the terms of the contract were essentially 'established' [at the date of contract] in light of the evidence submitted." Id. at 1328-29.

**II. Nakornthai II**

On remand, Commerce reconsidered its original determination, but again chose to use the date of invoice rather than the date of contract as the date of sale. See Final Results of Redetermination Pursuant to Remand, A-549-817, ADR 11/1/2004—10/31/2005 (July 28, 2008) ("First Remand Results").  Commerce distinguished Nakornthai's case from prior instances where Commerce found changes to contractual terms of sale insignificant, and thus used the contract date for date of sale. Id. 3-4 (discussing Certain Cut-to-Length Carbon Steel Plate from Romania, 72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007)(notice of final results of antidumping duty administrative review and final partial rescission) and accompanying Issues and Decision Memorandum, A-485-803, ADR 08/01/2004-07/31/2005 (Feb. 2, 2007), available at http://ia.ita.doc.gov/frn/summary/ROMANIA/E7-2216-1.pdf ("Romanian Plate"); Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 63 Fed. Reg. 32,833 (Dep't Commerce June 16, 1998) (final results of antidumping duty administrative review)).  In addition, Commerce refused to address Nakornthai's proposed alternative dates

of sale. Id. 11-12.  The court sustained these two determinations. Nakornthai II, 587 F. Supp. 2d at 1308-09, 1311-12.

However, Commerce seemingly ignored the court's specific instructions regarding analysis of Nakornthai's particular evidence, declaring that the change to the specific quantity shipped "is not [] relevant" and concluding that the "relevant change" was the elimination of the tolerance levels from the original contract. First Remand Results 5.  Rather, Commerce merely restated its prior hypothetically-based reasoning previously rejected by the court,[8] and therefore the court remanded again as to Commerce's factual findings on date of sale. Nakornthai II, 587 F. Supp. 2d at 1309.  The court instructed Commerce to, on remand:

> determine [in accordance with its standard practice], and explain its rationale, as to whether the evidence presented by Nakornthai of the change in the quantity shipped was actually of any significance, and whether, in context, this change materially affected the date that the terms of the contract were essentially established.

Id. at 1311.

---

[8] "Commerce determined that the mere removal of the [line item] quantity tolerance from the contract was significant because it 'provided [Nakornthai] with the flexibility to affect the product mix and, in turn, the overall dumping margin,' because 'the product mix . . . is used for matching purposes and the overall margin calculation.' Commerce then set forth a hypothetical example demonstrating how the tolerance removal 'could conceivably' permit Nakornthai to alter product combinations in an effort to impact the overall dumping margin. While Commerce did state that 'it is reasonable to characterize the quantity change as significant,' the agency did not provide a reasoned explanation on this issue, and immediately reiterated that this analysis '[was] not the basis' for its determination." Nakornthai II, 587 F. Supp. 2d at 1309 (citations omitted).

### III. Commerce's Second Remand Results

Pursuant to the court's second remand, Commerce once again re-examined its date of sale analysis.  See Second Remand Results 1, 3.  Commerce first determined "that the change in aggregate quantity shipped [by Nakornthai] is not, on its own, significant and does not, by itself, materially affect the date that the terms of contract were essentially established." Id. 3.  Commerce explained that, according to its practice, differences between aggregate quantity contracted for and shipped, as long as these differences fall within the overall quantity tolerance, do not constitute changes to material contractual terms. Id. 5-6 (citing Romanian Plate; Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Mexico, 65 Fed. Reg. 39,358 (Dep't Commerce June 26, 2000) (notice of final determination of sales at less than fair value)).[9]

But Commerce continued:

> [However,] when the change in aggregate quantity is considered in the context of ongoing amendments to material contract terms subsequent to [Nakornthai's] original contract date, including the elimination of the line item quantity tolerance from [Nakornthai's] original contract and subsequent amendments to payment and delivery terms, record evidence demonstrates a continuum of change to material contract terms that fails to overcome [Commerce's] regulatory presumption that invoice date is the appropriate date of sale.

---

[9] Because this determination is inconsistent with Commerce's consideration of line item quantity levels, discussed supra, the court expresses no view on the reasonableness of this asserted "standard practice."

Id. 3-4.  In other words, Commerce determined that "the context in which [the within-tolerance change] occurred demonstrates that the terms of [Nakornthai's] U.S. sales contract were not set in the original contract." Id. 7.

This "context" as considered by Commerce has several elements. First, Commerce noted that, unlike the record in Romanian Plate, "the record in this case lacks any similar evidence [of the parties' conclusion of a final agreement regarding terms of sale] supporting [Nakornthai's] proposal that [Commerce] rely upon the contract date." Id. 5.[10]  Second, Commerce identified a "series of changes to the material terms of sale" including (1) the elimination of the line item quantity tolerance, as well as (2) changes to payment terms and (3) amendments to delivery terms, that demonstrate that Nakornthai and its U.S. customer "did not share an agreement on final contract terms until the invoice date." Id. 7.

With respect to the elimination of the line item quantity tolerance level, Commerce stated that this "by itself" was material to its date of sale analysis because "it shows that parties did not share an agreement on the final terms of sale on the original

---

[10] The Romanian Plate respondent's evidence included "the specific language of the order acknowledgment -- language that Commerce deemed to definitively state 'that there can thereafter be no changes in the terms of sale' -- as well as affidavits from U.S. customers 'declaring that the order acknowledgments are understood as the parties' final agreement on quantities and prices ordered.'" Nakornthai II, 587 F. Supp. 2d at 1307 (quoting Romanian Plate 7).

contract date." Id. 13. Commerce also found that this change was "commercially significant" because Nakornthai's original contract

> stated that a certain quantity of each item would be shipped, and that a [line item] quantity beyond [  ]% of the [line item] quantity tolerance would constitute a breach of contract. Therefore, the final sale quantity . . . would have resulted in a breach of contract had the original contract not been subsequently amended. Amending the original contract to allow for a final shipment that would have constituted a breach of the original contract is a "significant" amendment for commercial purposes.

Id. (citation omitted).

Similarly, Commerce also concluded that, "as a factual matter, the amendments to payment and delivery terms demonstrate that the parties did not share an agreement concerning these material terms at the time of their original contract." Id. 8. Commerce determined that the fact that the payment and delivery terms, considered "material" in Commerce's practice, were subject to amendment "is sufficient to demonstrate their materiality . . . ." Id. 13. But Commerce further noted that "the record demonstrates that [the amendments to payment and delivery terms] impacted [sic] the sales transactions at issue." Id. 14. More particularly, the payment term change allowed Nakornthai to receive a certain percentage of its payment at an earlier point in time[11] than specified in the

---

[11] Commerce relied upon Nakornthai's reported payment date of [                    ] in determining Nakornthai's "credit expense calculation." Def.'s Resp. to Pl.'s Comments Regarding the Second Remand Determination ("Def.'s Resp.") 12. The credit expense "is the interest expense incurred (or interest revenue foregone) between shipment of merchandise to a customer and receipt of

original contract, and the changes to the letter of credit's
expiration and last shipment dates[12] gave Nakornthai [ ] additional
days to ship the subject merchandise to its customer and still be
entitled to full payment. Id.  Accordingly, these changes affected
"the credit calculation for [Nakornthai's] U.S. sales used to
derive [its] weighted-average dumping margin." Id.[13]

---

payment from the customer." Rebuttal to Pl.'s Comments on the
Dep't of Comm.'s Second Remand Results 16.

[12] Nakornthai reported, and Commerce relied upon, shipment
dates [                                              ] in
determining Nakornthai's "credit expense calculation." Moreover,
Nakornthai provided certain specified [    ] receipts that show
that its shipments were commenced and completed on certain dates,
from [                ] to [                ].  Thus, according
to Commerce, "[            ] of Nakornthai's shipments to the
United States were conducted in accordance with the shipment
terms present upon invoice date." Def.'s Resp. 12.

[13] According to Commerce:

The credit expense calculation functions as an
adjustment in Commerce's determination of an
antidumping margin that is aimed at valuing, in part,
the opportunity costs involved with the timing of the
transactions at issue.  Commerce's Antidumping Manual
explains that the most common adjustment for
differences in circumstances of sale is for differences
in credit costs, and that this adjustment is necessary
because there "is usually a period of time between the
shipment of merchandise to a customer and payment for
the merchandise." The manual further states that this
adjustment is required "to account for the opportunity
cost associated with the loss of the use of monies
involved," and that in "all instances where the
respondent provides shipment and payment dates, we use
this information to calculate the actual number of days
credit is outstanding."

In this case, Nakornthai reported its credit
expenses to Commerce using the following formula:

Finally, Commerce again refused to consider any alternate dates proposed by Nakornthai and limited its date of sale analysis to the contract and invoice dates. Id. 15. Accordingly, Commerce reaffirmed its conclusion to use invoice date. Id.

## STANDARD OF REVIEW

As in reviewing earlier Commerce determinations in this case, the court reviews remand determinations for compliance with the court's remand order. See NMB Sing. Ltd. v. United States, 28 CIT 1252, 1259-60, 341 F. Supp. 2d 1327, 1333-34 (2004); Olympia Indus., Inc. v. United States, 23 CIT 80, 82, 36 F. Supp. 2d 414,

---

> CREDITU {credit expenses} = GRSUPRU {gross unit price} x U.S. dollar interest rate X ((PAYDATEU {payment date} - SHIPDATU {shipment date})/365)

> Therefore, by definition, the shipment date or the payment date . . . reported by Nakornthai affects the credit calculation. Because Nakornthai's own reported shipment and payment dates, as well as the shipments and payments between Nakornthai and its United States customer, conform with the contract terms present at the time of the invoice date, Commerce's calculation of Nakornthai's credit expenses reflects Nakornthai's adherence to material contract terms present at the time of the invoice date and not the terms present in the original contract.

Def.'s Resp. 13-14 (quoting Import Administration Antidumping Manual, Ch. 8, 22-23, available at http://ia.ita.doc.gov/admanual/index.html (last visited Mar. 19, 2009)) (citations omitted). Commerce did not provide a specific calculation of this effect on the dumping margin, as "Commerce does not, as a matter of practice, calculate unofficial antidumping margins to demonstrate the difference between the actual antidumping margin and alternative margins that might result from different factual scenarios." Def.'s Resp. 14.

416 (1999).  Moreover, again, the agency's legal determinations on remand must be in accordance with law and its factual findings must be supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B); see Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003); AG der Dillinger Hüttenwerke v. United States, 28 CIT 94, 95, 310 F. Supp. 2d 1347, 1349 (2004). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp., 322 F.3d at 1374 (citations omitted).

## **DISCUSSION**

Commerce's Second Remand Results comply with the court's remand orders in Nakornthai I and Nakornthai II.  At the same time, the court cannot affirm Commerce's conclusion that the elimination of a line item quantity tolerance level from the contract constituted a significant change that materially affected Nakornthai's contract.  Nonetheless, based on Commerce's further analysis of the significance of the particular evidence presented in this case, the court otherwise deems Commerce's factual findings in its Second Remand Results to be supported by substantial evidence and its interpretation of its own regulation to be in accordance with law.

### **I. The Court Cannot Affirm Commerce's Conclusion Regarding Nakornthai's Elimination of the Line Item Quantity Tolerance Level**

Despite Commerce's conclusion, based on its established

practice, that differences in line item quantities, so long as the overall quantity is within the overall quantity tolerance level, are not significant, Commerce nonetheless concluded that the elimination of the line item tolerance from the contract was "material" in this case. Previously, in Nakornthai I and Nakornthai II, the court rejected Commerce's proffered hypothetical reasoning that this contractual change potentially allowed Nakornthai to manipulate the "product mix." Now, as explained in its Second Remand Results, Commerce presents a different rationale. Commerce reasons that, "[a]s a factual matter, the elimination of the line item quantity tolerance demonstrates that the parties did not share an agreement concerning quantity, a material contract term, at the time of their original contract." Second Remand Results 7. Commerce based its conclusion upon the court's previous holding that Commerce can reasonably consider the change to a line item quantity tolerance a "material" contract term, see Nakornthai I, 558 F. Supp. 2d at 1327, and upon the fact that the shipped quantity of the line item was 14.5% more than the upper end of the original tolerance level and more than 25% above the specific line item quantity for that product. Second Remand Results 7.

Nakornthai argues that Commerce, in employing "flawed" reasoning, has not followed the court's remand instructions with regard to its analysis of the elimination of the line item quantity tolerance level. Pl.'s Comments on the Dep't of Comm.'s Second

Remand Results Pursuant to Slip Op. 08-128 ("Pl.'s Comments") 1. More specifically, Nakornthai charges that Commerce once again relied on speculation and hypotheticals, as there was no actual breach of contract. Id. 5-6. Nakornthai also attacks Commerce's conclusions, that the amendment demonstrates that the contract was subject to change, as "absurd and illogical." Id. 9.

Nakornthai's position, though somewhat overstated, has merit. Commerce has once again attempted to make a factual finding of "potential" significance regarding the line item contractual quantity change, while at the same time making a factual finding that the change in quantities, in total, are not significant. Because of this inconsistency, Commerce has, with regard to this issue, again failed to provide a non-arbitrary, reasoned basis for its conclusion. Commerce argues that the elimination of the line item tolerance level, because that tolerance level is, as a legal matter, a material contract term, in and of itself materially alters the contract. But, as Nakornthai points out, this determination is directly contrary to the court's instructions in Nakornthai I. See Nakornthai I, 558 F. Supp. 2d at 1328 ("Commerce argues that the fact that the quantity tolerance level was changed, in whatever amount, demonstrates that the contract's material terms were subject to change and therefore not finally settled until the invoice date. The problem with this argument is that it begs the question of whether any such changes were insignificant.").

Nor, as the court has also previously instructed, can Commerce use speculative or hypothetical reasoning to support its conclusions. See Nakornthai II, 587 F. Supp. 2d at 1310 ("Commerce's use of hypotheticals, generalizations . . . and conditional language suggesting possible distortions in antidumping calculations offer conjecture rather than a reasoned explanation founded on substantial evidence." (quoting Hynix Semiconductor, Inc. v. United States, 27 CIT 1719, 1722, 295 F. Supp. 2d 1365, 1369 (2003), rev'd in part, 424 F.3d 1363, 1370 (Fed. Cir. 2005))). Thus, Commerce's hypothetical scenario, indicating that Nakornthai -- had it and its U.S. customer not amended the contract -- would have breached the contract when delivering its particular quantity of the relevant line item, is of limited persuasiveness. Because it is Commerce's practice to disregard changes that are not significant, see Nakornthai II, 587 F. Supp. 2d at 1309, Commerce cannot simultaneously rely on contractual changes that it has found insignificant to claim that such changes demonstrate that a contract's terms are not established.

Moreover, Commerce's argument is circular. Commerce contends that, because the contract was amended, the amendment was "commercially significant." Had the line item quantity shipped fallen within the original line item quantity tolerance, i.e., had the amount shipped been consistent with the original contractual terms, Nakornthai would have had no need to amend the contract in

the first place. Nonetheless, an amendment is not commercially significant simply because it changes a contractual term, even if that term is material.

Because Commerce, in making its date of sale determination, must, in accordance with its own regulation, make a factual determination with regard to whether the material terms were not set until invoice, and because Commerce's own practice in making such a determination is to disregard changes that are insignificant, the record must contain evidence sufficient to support the finding that the change to the material terms represented in the contract was significant.  Commerce still has not done so here with regard to the line item quantity tolerance level and, thus, Commerce has not demonstrated to the court that its determination of significance of the elimination of the line item quantity tolerance level is supported by substantial evidence.

## II. Commerce Nonetheless Provides Substantial Evidence to Support Its Decision

However, the court finds other reasons to sustain Commerce's Second Remand Results.  As a general matter, Commerce maintained that evidence, other than differences between contracted-for and shipped quantities, demonstrates that Nakornthai's contract was subject to change.  Commerce noted that Nakornthai has not provided evidence, such as that presented in Romanian Plate, that would warrant deviation from its presumption of using invoice date as date of sale. Second Remand Results 5.  In addition, Commerce noted

that it regularly considers payment and delivery terms as material terms of sale, id. 7 (citing SeAH Steel Corp. v. United States, 25 CIT 133, 134 (2001)), and concluded that Nakornthai's amendments to payment and delivery terms "demonstrate that the parties did not share an agreement concerning these material terms at the time of their original contract." Id. 8.

Nakornthai first takes issue with Commerce's statement that payment and delivery terms are generally considered by Commerce as "material," citing Certain Hot-Rolled Carbon Steel Flat Products from Thailand, 66 Fed. Reg. 49,622 (Dep't Commerce Sept. 28, 2001) (notice of final determination of sales at less than fair value). Commerce responds that its date of sale practice has "evolved," and that it "now considers, among other contractual terms, delivery and payment terms as material terms of sale." Def.'s Resp. 10.

The court accepts Commerce's reasonable interpretation of its regulatory practice and notes that this interpretation is supported by recent Commerce decisions. See, e.g., Issues & Decision Memorandum for Stainless Steel Sheet and Strip in Coils from Taiwan (final results of the fourth antidumping administrative review), A-583-831, AD/CVD 7/1/02-6/30/03 15 (Feb. 7, 2005), available at http://ia.ita.doc.gov/frn/summary/taiwan/E5-631-1.pdf ("The Department has interpreted 'material terms of sale' to include price, quantity, and payment terms . . . ."); Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil, 65 Fed. Reg.

5,554, 5,575 (Dep't Commerce 2000) (final determination) (payment terms); Issues & Decision Memorandum for Cold-Rolled Flat-Rolled Carbon Quality Steel Products from Turkey, A-489-808, POI 1998-99 Date of Sale cmt. 1 (Mar. 21, 2000), available at http://ia.ita.doc.gov/frn/summary/turkey/00-6992-1.txt (payment terms). Therefore, the court finds Commerce's legal conclusion that payment and delivery terms are "material" to be in accordance with law.

Second, according to Nakornthai, Commerce failed to make a significance finding for the payment term change or the delivery term change. Nakornthai charges that Commerce's analysis on these terms' affect on Nakornthai's credit calculation is also "purely conjectural," as

> [n]owhere does Commerce explain exactly how this is so, or how such minor changes to secondary terms of sale are otherwise "significant" to any aspect of the actual dumping calculation. In fact, Commerce never determines whether [Nakornthai] used additional days or received payment any earlier, nor has Commerce analyzed whether there was any actual impact on its dumping calculation. Not surprisingly, Commerce provides no citation to the record on its claim because there was no impact on the margin.

Pl.'s Comments 7. For the same reasons stated above with regard to the quantity tolerance level, the court cannot affirm Commerce's finding that merely because these material contractual terms were amended, such amendments in and of themselves demonstrate that the contract was subject to change.

Despite this deficiency, Commerce also made the requisite

factual findings of significance with regard to the change in payment and delivery terms. Commerce's decision has sufficiently demonstrated to the court that the payment and delivery terms affected the sales transaction in a significant way, that is, that these changes significantly affected the terms of Nakornthai's contract. Moreover, this demonstration is supported by substantial evidence. For example, the payment term change allowed Nakornthai to receive a significant portion, [    ], of its payment at an earlier point in time than specified in the original contract, and the changes to the letter of credit's expiration and last shipment dates gave Nakornthai [  ] additional days to ship the subject merchandise to its customer while still being entitled to full payment. Id. Indeed, "[              ] of Nakornthai's shipments to the United States were conducted in accordance with the shipment terms present upon invoice date." Supra note 12. In turn, these amendments changed the credit expense calculation used to compute Nakornthai's dumping margin for the period of review.[14]

Based on Commerce's findings and reasoned analysis regarding the delivery and payment terms of Nakornthai's contract, the court

---

[14] Note that the court here makes only a substantial evidence determination. The court does not conclude that an affect on the dumping margin is a necessary condition for a finding of significance. Nor does the court conclude that an affect on the dumping margin is necessarily sufficient for a finding of significance. Rather, the court concludes that the agency's finding of significance here is based on a reasonable interpretation of the record evidence.

concludes that Commerce's conclusion in the Second Remand Results -- that Nakornthai has not established that the material contract terms were established on a date other than invoice date -- is based on a reasonable interpretation of the "date-of-sale" regulation and on sufficient factual findings that are supported by substantial evidence.

## CONCLUSION

Therefore, upon consideration of the pending motions before the court, in accordance with this opinion, it is hereby:

ORDERED that the Department of Commerce's second remand determination is sustained. Judgement will be entered accordingly.


                                          /s/ Donald C. Pogue
                                        Donald C. Pogue, Judge


Dated: April 7, 2009
       New York, New York